# UNITED STATES *v.* MANDUJANO

No. 74–754.   Argued November 5, 1975—Decided May 19, 1976

BURGER, C. J., announced the Court's judgment and delivered an opinion, in which WHITE, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 584. STEWART, J., filed an opinion concurring in the judgment, in which BLACKMUN, J., joined, *post*, p. 609. STEVENS, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Acting Assistant Attorney General Keeney,* and *Shirley Baccus-Lobel.*

*Michael Allen Peters,* by appointment of the Court, 421 U. S. 944, argued the cause *pro hac vice* and filed a brief for respondent.*

---

*Briefs of *amici curiae* were filed by *Philip I. Palmer, Jr.,* for Richard O. Kelly; and by *Frederick H. Weisberg* for Gregory V. Washington.

MR. CHIEF JUSTICE BURGER announced the judgment of the Court in an opinion in which MR. JUSTICE WHITE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join.

This case presents the question whether the warnings called for by *Miranda* v. *Arizona,* 384 U. S. 436 (1966), must be given to a grand jury witness who is called to testify about criminal activities in which he may have been personally involved; and whether, absent such warnings, false statements made to the grand jury must be suppressed in a prosecution for perjury based on those statements.

(1)

During the course of a grand jury investigation into narcotics traffic in San Antonio, Tex., federal prosecutors assigned to the Drug Enforcement Administration Task Force learned of an undercover narcotics officer's encounter with respondent in March 1973. At that time, the agent had received information that respondent, who was employed as a bartender at a local tavern, was dealing in narcotics. The agent, accompanied by an informant, met respondent at the tavern and talked for several hours. During the meeting, respondent agreed to obtain heroin for the agent, and to that end placed several phone calls from the bar. He also requested and received $650 from the agent to make the purchase. Respondent left the tavern with the money so advanced to secure the heroin. However, an hour later respondent returned to the bar without the narcotics and returned the agent's money. Respondent instructed the agent to telephone him at the bar that evening to make arrangements for the transaction. The agent tried but was unable to contact respondent as directed. The record provides no explanation for respondent's failure to keep his appointment. No further action was taken by the agent, and the investigatory file on the matter

was closed. The agent did, however, report the information to federal prosecutors. At that time, the Government was seeking information on local drug traffic to present to a special grand jury investigating illicit traffic in the area.

Respondent was subpoenaed to testify before the grand jury on May 2, 1973; this was approximately six weeks after the abortive narcotics transaction at the tavern where respondent was employed. When called into the grand jury room and after preliminary statements, the following colloquy occurred between the prosecutor and respondent:

"Q. ... Now, you are required to answer all the questions that I ask you except for the ones that you feel would tend to incriminate you. Do you understand that?

"A. Do I answer all the questions you ask?

"Q. You have to answer all the questions except for those you think will incriminate you in the commission of a crime. Is that clear?

"A. Yes, sir.

"Q. You don't have to answer questions which would incriminate you. All other questions you have to answer openly and truthfully. And, of course, if you do not answer those [questions] truthfully, in other words if you lie about certain questions, you could possibly be charged with perjury. Do you understand that?

"A. Yes, sir.

.    .    .    .    .

"Q. Have you contacted a lawyer in this matter?

.    .    .    .    .

"A. I don't have one. I don't have the money to get one.

"Q. Well, if you would like to have a lawyer, he

cannot be inside this room. He can only be outside. You would be free to consult with him if you so chose. Now, if during the course of this investigation, the questions that we ask you, if you feel like you would like to have a lawyer outside to talk to, let me know." App. 5–6.

During the questioning respondent admitted that he had previously been convicted of distributing drugs, that he had recently used heroin himself, and that he had purchased heroin as recently as five months previously. Despite this admitted experience with San Antonio's heroin traffic, respondent denied knowledge of the identity of any dealers, save for a streetcorner source named Juan. Respondent steadfastly denied either selling or attempting to sell heroin since the time of his conviction 15 years before.

Respondent specifically disclaimed having discussed the sale of heroin with anyone during the preceding year and stated that he would not even try to purchase an ounce of heroin for $650. Respondent refused to amplify on his testimony when directly confronted by the prosecutor:

"Q. Mr. Mandujano, our information is that you can tell us more about the heroin business here in San Antonio than you have today. Is there anything you would like to add telling us more about who sells heroin?

"A. Well, sir, I couldn't help you because, you know, I don't get along with the guys and I just can't tell you, you know."

Following this appearance, respondent was charged by a grand jury on June 13, 1973, in a two-count indictment with attempting to distribute heroin in violation of 21 U. S. C. §§ 841 (a)(1), 846, and for willfully and

knowingly making a false material declaration to the grand jury in violation of 18 U. S. C. § 1623.[1] The falsity of his statements was conceded; his sole claim was that the testimony before the grand jury should be suppressed because the Government failed to provide the warnings called for by *Miranda*. Following an evidentiary hearing, the District Court granted respondent's motion to suppress. The court held that respondent was a "putative" or "virtual" defendant when called before the grand jury; respondent had therefore been entitled to full *Miranda* warnings. 365 F. Supp. 155 (WD Tex. 1973).[2]

The Court of Appeals affirmed. 496 F. 2d 1050 (CA5 1974). It recognized that certain warnings had in fact been given to respondent at the outset of his grand jury appearance. But the court agreed with the District Court that "full *Miranda* warnings should have been accorded Mandujano who was in the position of a virtual or putative defendant." *Id.*, at 1052. The essence of the Court of Appeals' holding is:

> "In order to deter the prosecuting officers from bringing a putative or virtual defendant before the grand jury, for the purpose of obtaining incriminating or

---

[1] Count 2 of the indictment charged that the following declarations were materially false:

"Q. Have you talked to anyone about selling heroin to them during the last year?

"A. No, sir.

"Q. And you have never told anyone that you would try to get heroin to sell to them?

"A. No, sir.

"Q. No one has ever given you any money—

"A. No.

"Q. —to go buy them heroin?

"A. No, sir."

[2] Respondent was subsequently tried and convicted under Count 1 of the indictment for attempting to distribute heroin. The grand jury testimony was not utilized by the prosecution at that trial.

perjur[i]ous testimony, the accused must be adequately apprised of his rights, *or all of his testimony, incriminating and perjur[i]ous, will be suppressed."* *Id.,* at 1056. (Emphasis added.)

In so ruling, the court undertook to distinguish its own holding in *United States* v. *Orta,* 253 F. 2d 312 (1958), in which Judge Rives, speaking for the court, stated:

"[A grand jury witness] might answer truthfully and thereafter assert the constitutional guaranty. *Under no circumstances, however, could he commit perjury and successfully claim that the Constitution afforded him protection from prosecution for that crime.* As said in Glickstein v. United States, [222 U. S. 139, 142 (1911),] '. . . the immunity afforded by the constitutional guaranty relates to the past, and does not endow the person who testifies with a license to commit perjury.'" *Id.,* at 314. (Emphasis added; citations omitted.)

In the *Orta* opinion, Judge Rives went on to observe:

"The only debatable question is one of the supervision of the conduct of Government representatives in the interest of fairness. In United States v. Scully, 2 Cir., 1955, 225 F. 2d 113, 116, the Court of Appeals for the Second Circuit held:

"'. . . the mere possibility that the witness may later be indicted furnishes no basis for requiring that he be advised of his rights under the Fifth Amendment, when summoned to give testimony before a Grand Jury.'

"That holding is applicable to the present record. There is no showing that the Grand Jury before which Orta testified was seeking to indict him or any other person already identified." *Ibid.*

The Court of Appeals concluded that the "totality of the circumstances" commanded suppression of all the testimony on which the charge of perjury rested.

We agree with the views expressed by Judge Rives in *Orta, supra,* and disagree with the Court of Appeals in the instant case; accordingly, we reverse.

### (2)

The grand jury is an integral part of our constitutional heritage which was brought to this country with the common law. The Framers, most of them trained in the English law and traditions, accepted the grand jury as a basic guarantee of individual liberty; notwithstanding periodic criticism, much of which is superficial, overlooking relevant history, the grand jury continues to function as a barrier to reckless or unfounded charges. "Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice." *Costello* v. *United States,* 350 U. S. 359, 362 (1956). Its historic office has been to provide a shield against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance.

Earlier we noted that the law vests the grand jury with substantial powers, because "[t]he grand jury's investigative power must be broad if its public responsibility is adequately to be discharged." *United States* v. *Calandra,* 414 U. S. 338, 344 (1974); *Branzburg* v. *Hayes,* 408 U. S. 665, 700 (1972). Indispensable to the exercise of its power is the authority to compel the attendance and the testimony of witnesses, *Kastigar* v. *United States,* 406 U. S. 441, 443 (1972), and to require the production of evidence, *United States* v. *White,* 322 U. S. 694 (1944).

When called by the grand jury, witnesses are thus legally bound to give testimony. *Calandra, supra,* at 343. This principle has long been recognized. In *United States* v. *Burr,* 25 F. Cas. 38 (No. 14,692e) (CC Va. 1807), Mr. Chief Justice Marshall drew on English precedents, aptly described by Lord Chancellor Hardwicke in the 18th century, and long accepted in America as a hornbook proposition: "The public has a right to every man's evidence." This Court has repeatedly invoked this fundamental proposition when dealing with the powers of the grand jury. *United States* v. *Nixon,* 418 U. S. 683, 709 (1974); *Branzburg* v. *Hayes, supra,* at 688; *Kastigar* v. *United States, supra,* at 443; *United States* v. *Monia,* 317 U. S. 424, 432 (1943) (Frankfurter, J., dissenting).

The grand jury's authority to compel testimony is not, of course, without limits. The same Amendment that establishes the grand jury also guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The duty to give evidence to a grand jury is therefore conditional; every person owes society his testimony, unless some recognized privilege is asserted.

Under settled principles, the Fifth Amendment does not confer an absolute right to decline to respond in a grand jury inquiry; the privilege does not negate the duty to testify but simply conditions that duty. The privilege cannot, for example, be asserted by a witness to protect others from possible criminal prosecution. *Rogers* v. *United States,* 340 U. S. 367 (1951); *United States* v. *Murdock,* 284 U. S. 141 (1931); *Hale* v. *Henkel,* 201 U. S. 43 (1906). Nor can it be invoked simply to protect the witness' interest in privacy. "Ordinarily, of course, a witness has no right of privacy before the grand jury." *Calandra, supra,* at 353.

The very availability of the Fifth Amendment privilege to grand jury witnesses, recognized by this Court in *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892), suggests that occasions will often arise when potentially incriminating questions will be asked in the ordinary course of the jury's investigation. Probing questions to all types of witnesses is the stuff that grand jury investigations are made of; the grand jury's mission is, after all, to determine whether to make a presentment or return an indictment. "The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes." *Costello* v. *United States, supra,* at 362.

It is in keeping with the grand jury's historic function as a shield against arbitrary accusations to call before it persons suspected of criminal activity, so that the investigation can be complete. This is true whether the grand jury embarks upon an inquiry focused upon individuals suspected of wrongdoing, or is directed at persons suspected of no misconduct but who may be able to provide links in a chain of evidence relating to criminal conduct of others, or is centered upon broader problems of concern to society. It is entirely appropriate—indeed imperative—to summon individuals who may be able to illuminate the shadowy precincts of corruption and crime. Since the subject matter of the inquiry is crime, and often organized, systematic crime—as is true with drug traffic—it is unrealistic to assume that all of the witnesses capable of providing useful information will be pristine pillars of the community untainted by criminality.

The Court has never ignored this reality of law enforcement. Speaking for the Court in *Kastigar* v. *United States,* MR. JUSTICE POWELL said:

"[M]any offenses are of such a character that the

only persons capable of giving useful testimony are those implicated in the crime." 406 U. S., at 446.

MR. JUSTICE WHITE made a similar observation in the context of a state investigation:

"[T]he very fact that a witness is called . . . is likely to be based upon knowledge, or at least a suspicion based on some information, that the witness is implicated in illegal activities . . . ." *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 102 (1964) (concurring opinion).

Moreover, the Court has expressly recognized that "[t]he obligation to appear is no different for a person who may himself be the subject of the grand jury inquiry." *United States* v. *Dionisio,* 410 U. S. 1, 10 n. 8 (1973).

There is nothing new about the Court's recognition of this reality of grand jury inquiries. In one of the early cases dealing with the Fifth Amendment privilege, the Court observed: "[I]t is only from the mouths of those having knowledge of the [unlawful conduct] that the facts can be ascertained." *Brown* v. *Walker,* 161 U. S. 591, 610 (1896).

Accordingly, the witness, though possibly engaged in some criminal enterprise, can be required to answer before a grand jury, so long as there is no compulsion to answer questions that are self-incriminating; the witness can, of course, stand on the privilege, assured that its protection "is as broad as the mischief against which it seeks to guard." *Counselman* v. *Hitchcock,* 142 U. S., at 562. The witness must invoke the privilege, however, as the "Constitution does not forbid the asking of criminative questions." *United States* v. *Monia,* 317 U. S., at 433 (Frankfurter, J., dissenting).

"The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying volun-

tarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *Id.*, at 427.

Absent a claim of the privilege, the duty to give testimony remains absolute.

The stage is therefore set when the question is asked. If the witness interposes his privilege, the grand jury has two choices. If the desired testimony is of marginal value, the grand jury can pursue other avenues of inquiry; if the testimony is thought sufficiently important, the grand jury can seek a judicial determination as to the bona fides of the witness' Fifth Amendment claim, *Malloy v. Hogan,* 378 U. S. 1, 11–12 (1964); *Hoffman v. United States,* 341 U. S. 479, 486–487 (1951), in which case the witness must satisfy the presiding judge that the claim of privilege is not a subterfuge. If in fact " 'there is reasonable ground to apprehend danger to the witness from his being compelled to answer,' " *Brown v. Walker, supra,* at 599, the prosecutor must then determine whether the answer is of such overriding importance as to justify a grant of immunity to the witness.

If immunity is sought by the prosecutor and granted by the presiding judge, the witness can then be compelled to answer, on pain of contempt, even though the testimony would implicate the witness in criminal activity. The reason for this is not hard to divine; Mr. Justice Frankfurter indicated as much in observing that immunity is the *quid pro quo* for securing an answer from the witness: "Immunity displaces the danger." *Ullmann v. United States,* 350 U. S. 422, 439 (1956); see also *Piemonte v. United States,* 367 U. S. 556, 560 (1961). Based on this recognition, federal

statutes conferring immunity on witnesses in federal judicial proceedings, including grand jury investigations, are so familiar that they have become part of our " 'constitutional fabric.' " *Lefkowitz* v. *Turley*, 414 U. S. 70, 81–82 (1973); *Ullmann* v. *United States, supra*, at 438. Immunity is the Government's ultimate tool for securing testimony that otherwise would be protected; unless immunity is conferred, however, testimony may be suppressed, along with its fruits, if it is compelled over an appropriate claim of privilege. *United States* v. *Blue*, 384 U. S. 251, 255 (1966). On the other hand, when granted immunity, a witness once again owes the obligation imposed upon all citizens—the duty to give testimony—since immunity substitutes for the privilege.

In this constitutional process of securing a witness' testimony, perjury simply has no place whatever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative. The power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is—and even the solemnity of the oath—cannot insure truthful answers. Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it.[3]

---

[3] Congress' view was expressed in the legislative history of the statute relating to false declarations before a grand jury or court, 18 U. S. C. § 1623:

"A subpena can compel the attendance of a witness before a grand jury or at trial. . . . But only the possibility of some sanction such as a perjury prosecution can provide any guarantee that his testimony will be truthful." S. Rep. No. 91–617, p. 57 (1969).

Similarly, our cases have consistently—indeed without exception—allowed sanctions for false statements or perjury; they have done so even in instances where the perjurer complained that the Government exceeded its constitutional powers in making the inquiry. See, *e. g., United States* v. *Knox,* 396 U. S. 77 (1969); *Bryson* v. *United States,* 396 U. S. 64 (1969); *Dennis* v. *United States,* 384 U. S. 855 (1966); *Kay* v. *United States,* 303 U. S. 1 (1938); *United States* v. *Kapp,* 302 U. S. 214 (1937).

In *Bryson,* a union officer was required by federal labor law to file an affidavit averring that he was not a Communist. The affidavit was false in material statements. In a collateral attack on his conviction, Bryson argued that since the statute required him either to incriminate himself or lie, he could not lawfully be imprisoned for failure to comply. This Court rejected the contention:

> "[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them." 396 U. S., at 72. (Footnote omitted.)

Even where a statutory scheme granted blanket immunity from further use of testimony, the Court has found perjured statements to fall outside the grant. In *Glickstein* v. *United States,* 222 U. S. 139 (1911), a bankrupt was indicted for perjury committed in the course of a bankruptcy proceeding. The Bankruptcy Act expressly conferred broad immunity on a bankrupt: "[N]o testimony given by him shall be offered in evidence against him in any criminal proceeding." *Id.,* at 140–141. The Court rejected the bankrupt's literalistic

interpretation of the statute as conferring immunity from prosecution for perjury:

"[T]he sanction of an oath and the imposition of a punishment for false swearing are inherently a part of the power to compel the giving of testimony, they are included in that grant of authority and are not prohibited by the immunity as to self-incrimination. . . . [I]t cannot be conceived that there is power to compel the giving of testimony where no right exists to require that the testimony shall be given under such circumstances and safeguards as to compel it to be truthful. . . . [T]he immunity afforded by the constitutional guarantee relates to the past and does not endow the person who testifies with a license to commit perjury." *Id.*, at 141–142.

(3)

In this case, the Court of Appeals required the suppression of perjured testimony given by respondent, as a witness under oath, lawfully summoned before an investigative grand jury and questioned about matters directly related to the grand jury's inquiry. The court reached this result because the prosecutor failed to give *Miranda* warnings at the outset of Mandujano's interrogation. Those warnings were required, in the Court of Appeals' view, because Mandujano was a "virtual" or "putative" defendant—that is, the prosecutor had specific information concerning Mandujano's participation in an attempted sale of heroin and the focus of the grand jury interrogation, as evidenced by the prosecutor's questions, centered on Mandujano's involvement in narcotics traffic. The fundamental error of the prosecutor, in the court's view, was to treat respondent in such a way as to " 'smack' of entrapment"; as a consequence, the court concluded that "elemental fairness" required the per-

jured testimony to be suppressed. 496 F. 2d, at 1058, and n. 8.

The court's analysis, premised upon the prosecutor's failure to give *Miranda* warnings, erroneously applied the standards fashioned by this Court in *Miranda*. Those warnings [4] were aimed at the evils seen by the Court as endemic to police interrogation of a person in custody.[5] *Miranda* addressed extrajudicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards. The decision expressly rested on the privilege against compulsory self-incrimination; the prescribed warnings sought to negate the "compulsion" thought to be inherent in police station interrogation. But the *Miranda* Court simply did not perceive judicial inquiries and custodial interrogation as equivalents: "[T]he compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U. S., at 461.

The Court thus recognized that many official investiga-

---

[4] "At the outset, if a person in [police] custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. . . .

"The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. . . .

"[A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . .

"[I]t is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him." 384 U. S., at 467–473.

[5] *Id.*, at 444 n. 4.

tions, such as grand jury questioning, take place in a setting wholly different from custodial police interrogation. Indeed, the Court's opinion in *Miranda* reveals a focus on what was seen by the Court as police "coercion" derived from "factual studies [relating to] police violence and the 'third degree' . . . physical brutality—beating, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions. . . ." *Id.*, at 445–446. To extend these concepts to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda;* the dynamics of constitutional interpretation do not compel constant extension of every doctrine announced by the Court.

The marked contrasts between a grand jury investigation and custodial interrogation have been commented on by the Court from time to time. MR. JUSTICE MARSHALL observed that the broad coercive powers of a grand jury are justified, because "in contrast to the police—it is not likely that [the grand jury] will abuse those powers." *United States* v. *Mara,* 410 U. S. 19, 46 (1973) (dissenting opinion). See also *In re Groban,* 352 U. S. 330, 347 (1957) (Black, J., dissenting).

### (4)

The warnings volunteered by the prosecutor to respondent in this case were more than sufficient to inform him of his rights—and his responsibilities—and particularly of the consequences of perjury. To extend the concepts of *Miranda,* as contemplated by the Court of Appeals, would require that the witness be told that there was an absolute right to silence, and obviously any such warning would be incorrect, for there is no such right before a grand jury. Under *Miranda,* a person in police custody has, of course, an absolute right to de-

cline to answer any question, incriminating or innocuous, see *Michigan* v. *Mosley*, 423 U. S. 96 (1975), whereas a grand jury witness, on the contrary, has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim. And even when the grand jury witness asserts the privilege, questioning need not cease, except as to the particular subject to which the privilege has been addressed. Cf. *id.*, at 103–104. Other lines of inquiry may properly be pursued.

Respondent was also informed that if he desired he could have the assistance of counsel, but that counsel could not be inside the grand jury room. That statement was plainly a correct recital of the law. No criminal proceedings had been instituted against respondent, hence the Sixth Amendment right to counsel had not come into play. *Kirby* v. *Illinois*, 406 U. S. 682 (1972). A witness "before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel . . . ." *In re Groban, supra*, at 333.[6] Under settled principles the witness may not insist upon the presence of his attorney in the grand jury room. Fed. Rule Crim. Proc. 6 (d).

Respondent, by way of further explanation, was also warned that he could be prosecuted for perjury if he testified falsely. Since respondent was already under oath to testify truthfully, this explanation was redundant; it served simply to emphasize the obligation already imposed by the oath.

> "Once a witness swears to give truthful answers, *there is no requirement to 'warn him not to commit perjury or, conversely to direct him to tell the truth.'* It would render the sanctity of the oath quite mean-

---

[6] The right to counsel mandated by *Miranda* was fashioned to secure the suspect's Fifth Amendment privilege in a setting thought inherently coercive. The Sixth Amendment was not implicated.

ingless to require admonition to adhere to it."
*United States* v. *Winter,* 348 F. 2d 204, 210 (CA2
1965). (Emphasis added.)

See also *United States* v. *Nickels,* 5C2 F. 2d 1173, 1176
(CA7 1974).

Similarly, a witness subpoenaed to testify before a
petit jury and placed under oath has never been entitled
to a warning that, if he violates the solemn oath to "tell
the truth," he may be subject to a prosecution for per-
jury, for the oath itself is the warning. Nor has any
case been cited to us holding that the absence of such
warnings before a petit jury provides a shield against use
of false testimony in a subsequent prosecution for perjury
or in contempt proceedings.[7]

In any event, a witness sworn to tell the truth before
a duly constituted grand jury will not be heard to call
for suppression of false statements made to that jury,
any more than would be the case with false testimony
before a petit jury or other duly constituted tribunal.[8]

---

[7] The fact that warnings were provided in this case to advise re-
spondent of his Fifth Amendment privilege makes it unnecessary to
consider whether any warning is required, as the Government asks
us to determine. In addition to the warning implicit in the oath,
federal prosecutors apparently make it a practice to inform a wit-
ness of the privilege before questioning begins.

[8] *Masinia* v. *United States,* 296 F. 2d 871, 877 (CA8 1961).
Cases voiding convictions for perjury involved situations where the
investigatory body was acting outside its lawful authority. *Brown*
v. *United States,* 245 F. 2d 549 (CA8 1957); *United States* v.
*Thayer,* 214 F. Supp. 929 (Colo. 1963); *United States* v. *Cross,*
170 F. Supp. 303 (DC 1959); *United States* v. *Icardi,* 140 F. Supp.
383 (DC 1956). For example, in *Brown* v. *United States, supra,* the
Court of Appeals concluded that a federal grand jury in Nebraska
had undertaken a "roving commission," investigating matters out-
side its lawful power. The District Court in that case had con-
cluded that the grand jury's activities had come " 'perilously close
to being a fraud on the jurisdiction of this Court.' " Quoted in 245

In another context, this Court has refused to permit a witness to protect perjured testimony by proving a *Miranda* violation. In *Harris* v. *New York,* 401 U. S. 222 (1971), the Court held that notwithstanding a *Miranda* violation:

> "[The Fifth Amendment] privilege cannot be construed to include the right to commit perjury." *Id.,* at 225.

More recently, the Court reaffirmed this salutary principle:

> "[T]he shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon* v. *Hass,* 420 U. S. 714, 722 (1975).

See also *Walder* v. *United States,* 347 U. S. 62 (1954); *United States* v. *DiGiovanni,* 397 F. 2d 409, 412 (CA7 1968); *Cargill* v. *United States,* 381 F. 2d 849 (CA10 1967); *United States* v. *DiMichele,* 375 F. 2d 959, 960 (CA3 1967).

The fact that here the grand jury interrogation had focused on some of respondent's specific activities does not require that these important principles be jettisoned; nothing remotely akin to "entrapment" or abuse of process is suggested by what occurred here. Cf. *Brown* v. *United States,* 245 F. 2d 549 (CA8 1957). Assuming, *arguendo,* that respondent was indeed a "putative defendant," that fact would have no bearing on the validity of a conviction for testifying falsely.

The grand jury was appropriately concerned about the sources of narcotics in the San Antonio area. The at-

---

F. 2d, at 553. No such circumstances are presented by this case. We therefore have no occasion to address the correctness of the results reached by the courts in these inapposite instances.

tempted heroin sale by respondent provided ample rea-
son to believe that he had knowledge about local heroin
suppliers. It was, therefore, entirely proper to question
him with respect to his knowledge of narcotics traffick-
ing.[9] Respondent was free at every stage to interpose
his constitutional privilege against self-incrimination, but
perjury was not a permissible option. As the Tenth
Circuit has held, the law provides "other methods for
challenging the government's right to ask questions."
*United States* v. *Pommerening*, 500 F. 2d 92, 100 (1974).

The judgment of the Court of Appeals is therefore
reversed, and the cause is remanded for further proceed-
ings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEVENS took no part in the consideration
or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MAR-
SHALL joins, concurring in the judgment.

I concur in the judgment of the Court, for "even
when the privilege against self-incrimination permits an
individual to refuse to answer questions asked by the
Government, if false answers are given the individual
may be prosecuted for making false statements."
*Mackey* v. *United States*, 401 U. S. 667, 705 (1971)
(BRENNAN, J., concurring in judgment). Although the

----

[9] This is not to suggest that the questioning would have been
improper if the principal aim of the grand jury's investigation had
centered upon respondent's activities, rather than a general investi-
gation into local narcotics traffic. As previously indicated, no
impropriety results from summoning the target of its inquiry,
*United States* v. *Dionisio*, 410 U. S. 1, 10 n. 8 (1973); it is appropri-
ate, in fact, to give that individual an opportunity to explain poten-
tially damaging information before the grand jury decides whether to
return an indictment.

Fifth Amendment guaranteed respondent the right to refuse to answer the potentially incriminating questions put to him before the grand jury, in answering falsely he took "a course that the Fifth Amendment gave him no privilege to take." *United States* v. *Knox*, 396 U. S. 77, 82 (1969). "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them." *Bryson* v. *United States*, 396 U. S. 64, 72 (1969) (footnote omitted). See also *Glickstein* v. *United States*, 222 U. S. 139, 142 (1911). Further, the record satisfies me that the respondent's false answers were not induced by governmental tactics or procedures so inherently unfair under all the circumstances as to constitute a prosecution for perjury a violation of the Due Process Clause of the Fifth Amendment.[1]

However, two aspects of the plurality opinion suggest a denigration of the privilege against self-incrimination and the right to the assistance of counsel with which I do not agree.

## I

The plurality opinion, *ante,* at 574–575, mechanically quotes *United States* v. *Monia,* 317 U. S. 424 (1943), for the proposition:

> "The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have

---

[1] Of course, whether the allegations concerning prosecutorial misconduct complained of by respondent in his motion to suppress contain "the seeds of a 'duress' defense, or perhaps whether his false statement[s were] not made 'willfully' as required by [18 U. S. C. § 1623], . . . must be determined initially at his trial." *United States* v. *Knox,* 396 U. S. 77, 83 (1969). Nothing in the plurality opinion forecloses respondent from raising such defenses at his trial.

been 'compelled' within the meaning of the Amendment." *Id.*, at 427.

*Monia* concerned only the scope of statutory immunity from prosecution under the Sherman Act, although the dictum or similar ones may also be found in other contexts. *E. g., Smith* v. *United States,* 337 U. S. 137, 147 (1949). However, the serious Fifth Amendment issues implicit within the dictum have never been directly confronted, and the only authority cited in *Monia, United States ex rel. Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103 (1927), is a slim reed upon which to rest that absolute proposition.[2] Moreover, the Court has repeatedly made other statements, clearly incompatible with the spirit if not the letter of the *Monia* dictum, evincing a much more accurate evaluation of the Fifth Amendment privilege, that "essential mainstay" of our "American system of criminal prosecution," *Malloy* v. *Hogan,* 378 U. S. 1, 7 (1964).[3] In my view, mechani-

[2] In *Vajtauer,* the only issue decided was the permissibility of using a prospective deportee's silence in a deportation proceeding as evidence against him where it was claimed that answers to the questions put might subject him to criminal penalties under state law. The Court clearly was skeptical of the "afterthought" assertion of the possibility of self-incrimination, 273 U. S., at 113, and, for reasons discussed, *infra,* at 591–592, properly concluded that in the circumstances there presented, the petitioner was obliged to put the immigration authorities on notice before he might assert the self-incrimination claim to defeat the evidentiary effect of his silence.

[3] For example, we have often said the Fifth Amendment prerequisite to the admissibility of an accused's statements is that they must have been " 'free and voluntary: that is, [they] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *Bram* v. *United States,* 168 U. S. 532, 542–543 (1897); *Malloy* v. *Hogan,* 378 U. S., at 7. "In other words the person must not have been compelled to incriminate himself. We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow

cally to repeat—in further dictum [4]—a statement made in a different factual and legal context, with no analysis of crucial Fifth Amendment policies and resting upon inapposite precedential authority, is indefensibly to default in our responsibility. For our duty is to supply the jurisprudential foundation necessary to ensure that Fifth Amendment values are adequately preserved when threatened in the context of a putative defendant called by a prosecutor and interrogated before a grand jury concerning personal acts for which the prosecution plans his criminal indictment.

This Court has consistently emphasized and, more importantly, has stood fast to ensure the essential premise underlying our entire system of criminal justice that "ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *Rogers* v. *Richmond,* 365 U. S. 534, 541 (1961).[5] Numerous opinions express the Court's deter-

---

a suspect to call his wife before he confessed." *Ibid.* "In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Miranda* v. *Arizona,* 384 U. S. 436, 460 (1966). Furthermore, "the Court has evaluated the knowing and intelligent nature of the waiver [under the 'intentional relinquishment or abandonment of a known right or privilege' standard of *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938)] . . . of the privilege against compulsory self-incrimination before an administrative agency or a congressional committee." *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 238 (1973) (footnote omitted).

[4] Reference to the *Monia* dictum is also dictum in this case for, as the plurality notes, *ante,* at 569 n. 2, respondent's testimony before the grand jury was not utilized by the prosecution at respondent's trial on the substantive count of attempted distribution of heroin.

[5] "Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice

588

mination to enforce the guarantee of an adversary system embodied in our Bill of Rights in the face of attempts, in the name of expediency and in ignorance of the lessons of history, to utilize inquisitional procedures. And the successful maintenance of the adversary system when threatened by these sometimes blatant but often more subtle assaults has had as a core underpinning the vigilance of this Court in jealously guarding the right of every person not to be compelled to be a witness against himself. *E. g., Watts* v. *Indiana,* 338 U. S. 49 (1949); *Blackburn* v. *Alabama,* 361 U. S. 199 (1960); *Culombe* v. *Connecticut,* 367 U. S. 568 (1961); *Malloy* v. *Hogan, supra; Miranda* v. *Arizona,* 384 U. S. 436 (1966); *Garrity* v. *New Jersey,* 385 U. S. 493 (1967); *Lefkowitz* v. *Turley,* 414 U. S. 70 (1973). The Fifth Amendment privilege, the "essential mainstay of our adversary system," *Miranda* v. *Arizona, supra,* at 460, "registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civi-

since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. See Ploscowe, The Development of Present-Day Criminal Procedures in Europe and America, 48 Harv. L. Rev. 433, 457–458, 467–473 (1935). Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. 'The law will not suffer a prisoner to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed., 1824). The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights—these are all characteristics of the accusatorial system and manifestations of its demands." *Watts* v. *Indiana,* 338 U. S. 49, 54 (1949).

lized.'" *Ullmann* v. *United States,* 350 U. S. 422, 426 (1956).

> "Cardinal . . . is the conviction, basic to our legal order, that men are not to be exploited for the information necessary to condemn them before the law, that, in Hawkins' words, a prisoner is not 'to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown (8th ed. 1824), 595. . . . [The] essence [of the principle] is the requirement that the state which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe* v. *Connecticut, supra,* at 581–582.

It is in light of this fundamental role of the Fifth Amendment privilege—with a deep "appreciat[ion of] the breadth and significance of the values that the Fifth Amendment was designed to protect," *Piccirillo* v. *New York,* 400 U. S. 548, 567 (1971) (BRENNAN, J., dissenting)—that the proper scope and treatment of the privilege must be analyzed in the context of the interrogation of a putative defendant before a grand jury.

## A

The institution of the grand jury—an institution mandated by the Fifth Amendment and "deeply rooted in Anglo-American history," *United States* v. *Calandra,* 414 U. S. 338, 342 (1974)—has historically also served as a bulwark for the individual citizen against use by officials of the powers of the Government in ways inconsistent with our notions of fundamental liberty. "[T]he Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by

'a presentment or indictment of a Grand Jury.' " *Id.,* at 343. "The basic purpose . . . was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes." *Costello* v. *United States,* 350 U. S. 359, 362 (1956). It is no less clear, however, that the grand jury, as with all institutions of Government, is subject to the fundamental restraints which guarantee our liberty, including the Fifth Amendment privilege against self-incrimination. *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892). And in delineating the scope and operation of the Fifth Amendment privilege necessary to secure its fundamental policies in the grand jury context, we must note that the nature of the grand jury is, of course, primarily inquisitional rather than adversary: the grand jury is "a grand inquest, . . . with powers of investigation and inquisition." *Blair* v. *United States,* 250 U. S. 273, 282 (1919). Given this characterizing principle, we are alerted to the danger that in the absence of a subtle and flexible mode of constitutional analysis—an analysis certainly not illustrated in the *Monia* dictum—the fundamentals of the Fifth Amendment privilege may be subverted by talismanic invocation of the role of the grand jury in our constitutional system. A more discriminating analysis is fully in keeping with the historic role of this Court, for, as said by Mr. Chief Justice Marshall in the identical context of conflict between the role of the grand jury and the Fifth Amendment privilege: "When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent." *United States* v. *Burr,* 25 F. Cas. 38, 39 (No. 14,692e) (CC Va. 1807).[6] Close

----

[6] Only "[t]hrough the consistently liberal construction it has been afforded by the Supreme Court [has] the privilege . . . been the

scrutiny and attention to competing constitutional policies is required in this area of conflicting principles if the "Court [is] zealous[ly] to safeguard the values that underlie the privilege." *Kastigar* v. *United States,* 406 U. S. 441, 445 (1972).

In my view, the conception of the Fifth Amendment privilege expressed in the *Monia* dictum is explainable only by reference to the facts and circumstances of the only case cited in support by *Monia—United States ex rel. Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103 (1927). That case involved questions concerning the Fifth Amendment privilege in a deportation proceeding. In holding that the prospective deportee's privilege against compulsory self-incrimination had not been violated in the circumstances, the Court rested on the failure to assert any claim of privilege in the proceeding. *Id.,* at 113. Essential to the Court's holding was the observation:

> "It is for the tribunal conducting the trial to determine what weight should be given to the contention of the witness that the answer sought will incriminate him, . . . a determination which it cannot make if not advised of the contention. . . . The privilege may not be relied on and must be deemed waived if not in some manner fairly brought to the attention of the tribunal which must pass upon it." *Ibid.*

It is only in a context where this "lack of notice on the part of the government" rationale has significance that we can possibly justify the *Monia* dictum that a witness testifying under judicial compulsion—that classic form of compulsion to which the Fifth Amendment is cen-

---

firmest limitation upon inquisitorial power in the grand jury." Rief, The Grand Jury Witness and Compulsory Testimony Legislation, 10 Am. Crim. L. Rev. 829, 852 (1972).

trally addressed [7]—must claim the privilege or else, without any further analysis, "he will not be considered to have been 'compelled' within the meaning of the Amendment." 317 U. S., at 427.[8]

This view of the nature and scope of the Fifth Amendment privilege was reaffirmed by the Court this very Term:

> "Unless the Government *seeks* testimony that will subject its giver to criminal liability, the constitutional right to remain silent absent immunity does not arise. An individual therefore properly may be compelled to give testimony, for example, in a noncriminal investigation of himself. . . . Unless a witness objects, a government *ordinarily may assume* that its compulsory processes are not eliciting testimony that he deems to be incriminating. Only the witness knows whether the *apparently innocent* dis-

---

[7] When the grand jury exercises its judicial power to compel the attendance and testimony of witnesses, it is, of course, exhibiting a classic instance of *judicial compulsion;* that very phenomenon against which the central meaning of the Fifth Amendment privilege is to confer on every citizen an absolute right to refuse testimony which may subject him to criminal prosecution. Meshbesher, Right to Counsel Before Grand Jury, 41 F. R. D. 189, 198–199 (1966). As Mr. Justice Rutledge said when sitting on the Court of Appeals for the District of Columbia Circuit:

"[The Fifth Amendment privilege] protects against the force of the court itself. It guards against the ancient abuse of judicial inquisition. Before it judicial power, including contempt, to enforce the usual duty to testify, dissolves. No other violence or duress is needed to bring it into play than the asking of a question." *Wood* v. *United States,* 75 U. S. App. D. C. 274, 277, 128 F. 2d 265, 268 (1942).

[8] See also *United States* v. *Monia,* 317 U. S., at 439–440, 442 (Frankfurter, J., dissenting); *United States* v. *Scully,* 225 F. 2d 113, 118 (CA2), cert. denied, 350 U. S. 897 (1955) (Frank, J., concurring in result).

closure sought may incriminate him, and the burden appropriately lies with him to make a timely assertion of the privilege. . . .

"In addition, the rule that a witness must claim the privilege is consistent with the fundamental purpose of the Fifth Amendment—the preservation of an adversary system of criminal justice. . . . *That system is undermined when a government deliberately seeks to avoid the burdens of independent investigation by compelling self-incriminating disclosures.* In areas where a government cannot be said to be compelling such information, however, there is no such circumvention of the constitutionally mandated policy of adversary criminal proceedings." *Garner* v. *United States,* 424 U. S. 648, 655–656 (1976) (emphasis added).

Indeed, in the situation where a prior claim is excused and a knowing and completely voluntary waiver of the privilege is required—the situation of the *Miranda*-type custodial interrogation—the reason is that "the inquiring government is *acutely aware* of the potentially incriminatory nature of the disclosures sought." *Garner, supra,* at 657 (emphasis added). Similarly, the prior claim is excused in the *Marchetti-Grosso*[9] situation, and the privilege confers an absolute right not to file an information return required by the government precisely because the required filing is directed to a class of persons "the great majority of whom [are] likely to incriminate themselves by responding," *Garner, supra,* at 660, and, therefore, "as in the coerced-confession cases, any compulsion to disclose [is] likely to compel self-incrimination." *Ibid.* I submit that this more discriminating analysis is also required in the situation in which

[9] *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968).

a putative or *de facto* defendant is called to testify under judicial compulsion before a grand jury; otherwise we countenance a serious erosion of fundamental guarantees of the Constitution.

## B

It is clear that the government may not in the absence of an intentional and knowing waiver call an indicted defendant before a grand jury and there interrogate him concerning the subject matter of a crime for which he already stands formally charged. *Lawn* v. *United States,* 355 U. S. 339 (1958); *United States* v. *Calandra,* 414 U. S., at 345, 346. The Fifth Amendment requires suppression of any statements of the accused that were so obtained.[10] True, as noted *ante,* at 573–574, calling a person "who may himself be the subject of the grand jury inquiry" is not a violation *per se* of the Fifth Amendment. *United States* v. *Dionisio,* 410 U. S. 1, 10 n. 8 (1973). This general proposition may be justified as necessary to the basic policy that the public has a right to every man's evidence, *United States* v. *Nixon,* 418 U. S. 683, 709 (1974), but in my view it must yield in situations risking vast potential for abuse in the absence of further safeguards calculated to preserve the policies underlying our adversary system.

It cannot be gainsaid that prosecutors often do call before grand juries persons suspected of criminal activity to testify concerning that activity, *e. g., Grunewald* v.

---

[10] Although there may be some ambiguity in the opinion in *Lawn* v. *United States* as to whether the multiple references to "tainted" evidence were based on the legal conclusion that the evidence, having been obtained by calling indicted defendants before a grand jury, was obtained in violation of the Fifth Amendment privilege, later decisions resolved any doubt on this score. *United States* v. *Calandra,* 414 U. S., at 345, 346.

*United States,* 353 U. S. 391, 423 (1957), and the availability of this device has often been fatally tempting to those aware of its potential for abuse.[11] There can be no doubt that sanctioning unfettered discretion in prosecutors to delay the seeking of criminal indictments pending the calling of criminal suspects before grand juries to be interrogated under conditions of judicial compulsion runs the grave risk of allowing "the prosecution [to] evade its own constitutional restrictions on its powers by turning the grand jury into its agent." *United States* v. *Mara,* 410 U. S. 19, 29 (1973) (Douglas, J., dissenting).[12] In such situations an individual's only protection against the mobilized power of the State is his Fifth Amendment privilege, but it is a protection of which there must be safeguards to make him aware. Careful measures are needed if the privilege is "still [to stand] guard when so much is attempted by inquisition, however subtle, at any stage of the [criminal] proceedings." *Wood* v. *United States,* 75 U. S. App. D. C. 274, 288, 128 F. 2d 265, 279 (1942) (per Rutledge, J.).

Given the prosecutor's authority to choose the precise timing of a criminal indictment, it is not surprising that commentary uniformly decries the attempted distinction between a *de facto* and *de jure* defendant in the determi-

---

[11] *E. g., Hooley* v. *United States,* 209 F. 2d 234, 235 (CA1 1954); *United States* v. *Pepe,* 367 F. Supp. 1365, 1367, 1370 (Conn. 1973); *United States* v. *Garnes,* 156 F. Supp. 467, 469 (SDNY 1957), aff'd, 258 F. 2d 530 (CA2 1958), cert. denied, 359 U. S. 937 (1959).

[12] Federal prosecutors, it has been asserted, have also taken advantage of the *de facto/de jure* distinction to postpone indictments and thereby utilize the subpoena power of the grand jury to obtain discovery in evasion of the strictures on Government discovery pursuant to Fed. Rule Crim. Proc. 16 (c). Tigar & Levy, The Grand Jury as the New Inquisition, 50 Mich. St. B. J. 693, 700 (1971).

nation of the amount of protection accorded by the Fifth Amendment privilege.

> "Distinctions based on status have created an incongruous grand jury witness, the *de facto* defendant who, though not formally accused, is marked for prosecution.  Functionally indistinguishable from a *de jure* defendant, he enjoys only the protection of an unimplicated witness and must submit to interrogation without apprisal of the charge pending against him or of his fifth amendment rights.  The prosecutor can take advantage of this anomalous treatment by deferring formal charge, summoning a *de facto* defendant before the grand jury and seeking disclosures which ensure indictment and may be used at trial."   Note, Self Incrimination by Federal Grand Jury Witnesses: Uniform Protection Advocated, 67 Yale L. J. 1271, 1276–1277 (1958) (footnotes omitted).[13]

Indeed, it seems obvious that a *de facto* defendant's privilege is placed in much greater jeopardy than that of a *de jure* defendant, who has at least been informed of the charges against him and is more likely to have consulted with counsel and thereby have been made aware of his privilege.  *In re Kelly*, 350 F. Supp. 1198, 1202 (ED Ark. 1972).

Even more serious, the use by prosecutors of the tactic of calling a putative defendant before a grand jury and interrogating him regarding the transactions

---

[13] See also Boudin, The Federal Grand Jury, 61 Geo. L. J. 1, 3 (1972); Dash, The Indicting Grand Jury: A Critical Stage?, 10 Am. Crim. L. Rev. 807, 809–810 (1972); Meshbesher, *supra*, n. 7, at 190; Note, The Rights of a Witness Before a Grand Jury, 1967 Duke L. J. 97; Note, Self-Incrimination Before a Federal Grand Jury, 45 Iowa L. Rev. 564, 571 (1960); Comment, The Grand Jury Witness' Privilege Against Self-Incrimination, 62 Nw. L. Rev. 207, 223 (1967).

and events for which he is about to be indicted is, in
the absence of an "intentional relinquishment or aban-
donment" of his "known" privilege against compulsory
self-incrimination, *Schneckloth* v. *Bustamonte,* 412 U. S.
218, 235 (1973); *Johnson* v. *Zerbst,* 304 U. S. 458,
464 (1938), a blatant subversion of the fundamental ad-
versary principle—that the State "establish its case, not
by interrogation of the accused even under judicial safe-
guards, but by evidence independently secured through
skillful investigation." *Watts* v. *Indiana,* 338 U. S., at
54. Where such prosecutorial tactics are employed, it
borders on the absurd to say, as is said in justification of
the *Monia* dictum, that the "government . . . may assume
that its compulsory processes are not eliciting" incrimi-
nating information, *Garner,* 424 U. S., at 655. Rather, it
is clear beyond question that the government is "acutely
aware of the potentially incriminatory nature of the dis-
closures sought," *id.,* at 657, and thus one cannot avoid
the conclusion that in condoning resort to such tactics,
the courts become partners in "undermin[ing]" the "ad-
versary system of criminal justice" by allowing prosecu-
tors "deliberately [to seek] to avoid the burdens of
independent investigation by compelling self-incriminat-
ing disclosures." *Id.,* at 655–656. Such tactics by pros-
ecutors are exemplars of the very evils sought to be
prevented by the enshrinement of the Fifth Amendment
privilege in the Constitution.[14]   In giving those tactics our
stamp of approval we turn our backs on our recognition

---

[14] "[I]t was historically this situation [the preliminary inquisition
of one not yet charged with an offense] which gave rise to the
privilege. The system of 'inquisition,' properly so called, signifies
an examination on mere suspicion, without prior presentment, indict-
ment, or other formal accusation . . . ; and the contest for one
hundred years centered solely on the abuse of such a system."
8 J. Wigmore, Evidence § 2251, p. 295 n. 1 (McNaughton rev.
1961).

heretofore that it is crucial that courts "be 'alert to repress' any abuses of the investigatory power invoked, bearing in mind that . . . 'the most valuable function of the grand jury . . . [has been] not only to examine into the commission of crimes, but to stand between the prosecutor and the accused.' " *Hoffman* v. *United States,* 341 U. S. 479, 485 (1951), quoting *Hale* v. *Henkel,* 201 U. S. 43, 65 (1906). "[A] defendant's right not to be compelled to testify against himself at his own trial might be practically nullified if the prosecution could previously have required him to give evidence against himself before a grand jury." *Michigan* v. *Tucker,* 417 U. S. 433, 441 (1974).

## C

Thus, I would hold that, in the absence of an intentional and intelligent waiver by the individual of his known right to be free from compulsory self-incrimination, the Government may not call before a grand jury one whom it has probable cause—as measured by an objective standard[15]—to suspect of committing a crime, and by use of judicial compulsion compel him to testify with

---

[15] Others have argued for a rule which would combine objective elements with the prosecutor's subjective intent subsequently to charge the individual by indictment. See *United States* v. *Scully,* 225 F. 2d, at 117 (Frank, J., concurring in result). But this subjective-intent requirement may pose grave administrative difficulties, see *United States* v. *Grossman,* 154 F. Supp. 813, 817 (NJ 1957), whereas the purely objective standard is easily manageable both for the prosecutor at the point of decision to call an individual suspect before the grand jury, and for the reviewing court. Clearly it costs the prosecutor nothing in terms of constitutionally permissible criteria to resolve any doubts in favor of warning the witness. I would at present leave open the proper answer to the case of a witness called to testify in the absence of probable cause, but whose testimony thereafter develops a case of probable cause.

regard to that crime.[16]   In the absence of such a waiver, the Fifth Amendment requires that any testimony obtained in this fashion be unavailable to the Government

[16] Cf. *United States* v. *Wong,* 553 F. 2d 576 (CA9 1974), cert. pending, No. 74–635 (*Miranda* warnings required for putative defendant); *United States* v. *Washington,* 328 A. 2d 98, 100 (Ct. App. DC 1974), cert. pending, Nos. 74–1106, 74–6579 (requiring a knowing and intelligent waiver of the privilege by a "potential" defendant); *United States* v. *Luxenberg,* 374 F. 2d 241, 246 (CA6 1967) (warning concerning the privilege required for one "virtually in the position of a defendant"); *United States* v. *Orta,* 253 F. 2d 312, 314 (CA5). cert. denied, 357 U. S. 905 (1958) (knowing and intelligent waiver of privilege required for "a witness"); *Stanley* v. *United States,* 245 F. 2d 427, 434 (CA6 1957) (protection afforded a defendant in custody extended to witnesses "virtually in the position of a defendant"); *United States* v. *Pepe,* 367 F. Supp., at 1369 (warning required for a "potential" defendant); *In re Kelly,* 350 F. Supp. 1198, 1205 (ED Ark. 1972) (warning required if "even a remote possibility of prosecution"); *United States* v. *Kreps,* 349 F. Supp. 1049, 1053–1054 (WD Wis. 1972) (*Miranda* warnings required for "prime suspect"); *United States* v. *Fruchtman,* 282 F. Supp. 534, 536 (ND Ohio 1968) (warning required for one " 'virtually in the position of a defendant' "); *Mattox* v. *Carson,* 295 F. Supp. 1054, 1059 (MD Fla. 1969) (*Miranda* warnings required for "potential defendants"), rev'd on other grounds, 424 F. 2d 202 (CA5), cert. denied, 400 U. S. 822 (1970); *United States* v. *Haim,* 218 F. Supp. 922, 932 (SDNY 1963) (warning required for "potential" defendant); *United States* v. *DiGrazia,* 213 F. Supp. 232, 234 (ND Ill. 1963) (warning and execution of formal waiver required for any witness); *United States* v. *Grossman, supra,* at 816 (warning required at least for "target" defendant).   See also *Powell* v. *United States,* 96 U. S. App. D. C. 367, 372, 226 F. 2d 269, 274 (1955) (serious constitutional question whether prosecutor may call before grand jury "person against whom an indictment was being sought"); *United States* v. *Scully, supra,* at 116 ("suppos[ing] . . . as a matter of ethics or fair play or policy, a prosecutor would . . . refrain from calling as a witness before a Grand Jury any person who is *de jure* or *de facto* an accused"); *id.,* at 118 (Frank, J., concurring in result) (suggesting a warning for any person called whom the prosecutor intends to indict); *United States* v. *Grunewald,* 233

for use at trial. Such a waiver could readily be demonstrated by proof that the individual was warned prior to questioning that he is currently subject to possible criminal prosecution for the commission of a stated crime, that he has a constitutional right to refuse to answer any and all questions that may tend to incriminate him, and by record evidence that the individual understood the nature of his situation and privilege prior to giving testimony.

> "Some courts have reasoned that because of the investigative function and inquisitorial nature of the grand jury, it cannot be burdened with affording a witness the full panoply of procedural safeguards. [However, i]t is *because* in a grand jury proceeding there is no right to other procedural safeguards that a witness should be told of his right to remain silent." *In re Kelly,* 350 F. Supp., at 1202.

Certainly to the extent that our task is to weigh "the potential benefits" to be derived from this requirement against the "potential injury to the historic role and functions of the grand jury," *United States* v. *Calandra,* 414 U. S., at 349, we must come down on the side of imposing this requirement if subversion of the adversary process is to be avoided where suspected persons are

---

F. 2d 556, 576 n. 10 (CA2 1956) (Frank, J., dissenting in part), rev'd, 353 U. S. 391 (1957) (warning required for any witness); *Connelly* v. *United States,* 249 F. 2d 576, 581 (CA8 1957), cert. denied, 356 U. S. 921 (1958) (approving suppression of all testimony, even in presence of warnings, after point prosecutor decided to indict); *United States* v. *Nickels,* 502 F. 2d 1173, 1176 (CA7 1974), cert. pending, No. 74–735 (by implication *Miranda* warning required for "potential defendant"); *Kitchell* v. *United States,* 354 F. 2d 715, 720 (CA1), cert. denied, 384 U. S. 1011 (1966) (by implication warning required for person "clearly suspected"); *United States* v. *De Sapio,* 299 F. Supp. 436, 440 (SDNY 1969) (by implication warning required for "target" defendant).

ignorant of their rights. In no way does the require-
ment of a knowing waiver "interfere with the effective
and expeditious discharge of the grand jury's duties," *id.*,
at 350; [17] or "saddle a grand jury with minitrials and pre-
liminary showings [that] would . . . impede its investiga-
tion," *United States* v. *Dionisio,* 410 U. S., at 17; or
"delay and disrupt grand jury proceedings," *Calandra,
supra,* at 349. And plainly the requirements of an
effective warning and an intelligent waiver by a putative
defendant prior to attempts to elicit potentially incrimi-
nating information impose no onerous duty on the prose-
cutor. The reported decisions of the lower federal courts
are replete with examples of prosecuting officials proffer-
ing such warnings as an essential element of our funda-
mental liberties. [18] Where uncertain whether the situation

---

[17] It is certainly no response to argue that a *de facto* defendant
is more likely to offer self-incriminatory testimony and thereby ad-
vance the needs of law enforcement if only he is left in ignorance
of his constitutional rights. The Constitution has already made the
underlying value choice, and it is not this Court's function to deni-
grate it.

"No doubt the constitutional privilege may, on occasion, save a
guilty man from his just deserts. It was aimed at a more far-
reaching evil—a recurrence of the Inquisition and the Star Chamber,
even if not in their stark brutality. Prevention of the greater evil
was deemed of more importance than occurrence of the lesser evil.
Having had much experience with a tendency in human nature to
abuse power, the Founders sought to close the doors against like
future abuses by law-enforcing agencies." *Ullmann* v. *United States,*
350 U. S. 422, 428 (1956).

[18] *E. g., United States* v. *Wong, supra; United States* v. *Nickels,
supra; United States* v. *Daniels,* 461 F. 2d 1076, 1077 (CA5 1972);
*United States* v. *Friedman,* 445 F. 2d 1076, 1088 (CA9), cert. denied
*sub nom. Jacobs* v. *United States,* 404 U. S. 958 (1971); *United
States* v. *Mingoia,* 424 F. 2d 710, 713–714 (CA2 1970); *Gollaher*
v. *United States,* 419 F. 2d 520, 523 (CA9), cert. denied, 396 U. S.
960 (1969); *United States* v. *Corallo,* 413 F. 2d 1306, 1328 (CA2),
cert. denied, 396 U. S. 958 (1969); *United States* v. *Levinson,* 405

requires it, the prosecutor may safely err on the side of ensuring the knowing and intentional nature of the waiver, for he does no more than discharge his responsibility to safeguard a constitutional guarantee calculated to ensure the liberty of us all. Only when these safeguards are afforded a putative defendant called and interrogated before a grand jury may we truthfully proclaim that the Fifth Amendment "privilege . . . is as broad as the mischief against which it seeks to guard." *Counselman* v. *Hitchcock,* 142 U. S., at 562; *ante,* at 574.

## II

A second and also disturbing facet of the plurality opinion today is its statement that "[n]o criminal proceedings had been instituted against respondent, hence the Sixth Amendment right to counsel had not come into play." *Ante,* at 581. It will not do simply to cite, as does the plurality opinion, *Kirby* v. *Illinois,* 406 U. S. 682 (1972), for this proposition. *Kirby*'s premise, so fundamental that it was "note[d] at the outset," was that "the constitutional privilege against compulsory self-incrimination is in no way implicated here." *Id.,* at 687. In sharp contrast, the privilege against compulsory self-incrimination is inextricably involved in this case since a putative defendant is called and interrogated before a grand

---

F. 2d 971, 979 (CA6 1968), cert. denied *sub nom. Strang* v. *United States,* 395 U. S. 906 (1969); *United States* v. *DiMichele,* 375 F. 2d 959, 960 (CA3), cert. denied, 389 U. S. 838 (1967); *United States* v. *Irwin,* 354 F. 2d 192, 199 (CA2 1965), cert. denied, 383 U. S. 967 (1966); *Kitchell* v. *United States, supra,* at 720; *United States* v. *Winter,* 348 F. 2d 204, 205 (CA2), cert. denied, 382 U. S. 955 (1965); *Connelly* v. *United States, supra,* at 581; *United States* v. *De Sapio, supra,* at 440; *United States* v. *Zirpolo,* 288 F. Supp. 993, 1007 (NJ 1968); *United States* v. *Leighton,* 265 F. Supp. 27, 36–37 (SDNY 1967); *United States* v. *Haim, supra,* at 932; *United States* v. *Grunewald,* 164 F. Supp. 640, 641 (SDNY 1958); *United States* v. *Hoffa,* 156 F. Supp. 495, 510–512 (SDNY 1957).

jury. Clearly in such a case a defendant is "faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id.*, at 689.

It is true that dictum in *In re Groban*, 352 U. S. 330, 333 (1957), denied there is any constitutional right of a witness to be represented by counsel when testifying before a grand jury. But neither *Groban* nor any other case in this Court has squarely presented the question.[19] Moreover, more recent decisions, *e. g.*, *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), recognizing the "substantive affinity" and therefore the "coextensive[ness]" in certain circumstances of the right to counsel and the privilege against compulsory self-incrimination, *Wood* v. *United States*, 75 U. S. App. D. C., at 280, 128 F. 2d, at 271 (per Rutledge, J.), have led many to question the continuing vitality of such older dicta.[20]

Accepted principles require scrutiny of any situation wherein a right to the assistance of counsel is claimed by "analyz[ing] whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice."

[19] Ironically, the greatest impediment to the development of the law concerning a grand jury witness' right to some form of assistance of counsel has been reliance upon the traditional absence of counsel in grand jury proceedings for denial of assistance of counsel in administrative proceedings. *E. g.*, *In re Groban*; *Hannah* v. *Larche*, 363 U. S. 420 (1960). See Recent Developments, Criminal Procedure—Right to Counsel in Investigative Grand Jury Proceedings: Washington Criminal Investigative Act of 1971, 47 Wash. L. Rev. 511, 513 n. 11 (1972).

[20] *E. g.*, Boudin, *supra*, n. 13; Dash, *supra*, n. 13; Meshbesher, *supra*, n. 7; The Grand Jury: Powers, Procedures, and Problems, 9 Col. J. L. & Soc. Prob. 681, 713 (1973); The Supreme Court, 1963 Term, 78 Harv. L. Rev. 143, 222 (1964); Note, 1967 Duke L. J., *supra*, n. 13; Recent Developments, *supra*, n. 19.

*United States* v. *Wade,* 388 U. S. 218, 227 (1967); *Coleman* v. *Alabama,* 399 U. S. 1, 7 (1970). And the question of whether the guidance of counsel is ordinarily required to enable an individual effectively to avoid prejudice to his Fifth Amendment privilege was clearly answered by this Court last Term.

> "The assertion of a testimonial privilege, as of many other rights, often depends upon legal advice from someone who is trained and skilled in the subject matter, and who may offer a more objective opinion. A layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege. It is not a self-executing mechanism; it can be affirmatively waived, or lost by not asserting it in a timely fashion." *Maness* v. *Meyers,* 419 U. S. 449, 466 (1975).[21]

Given the inherent danger of subversion of the adversary system in the case of a putative defendant called to testify before a grand jury, and the peculiarly critical role of the Fifth Amendment privilege as the bulwark against such abuse, it is plainly obvious that some guidance by counsel is required. This conclusion entertains only the "realistic recognition of the obvious truth that the average [putative] defendant does not have the professional legal skill to protect himself when brought before a tribunal . . . wherein the prosecution is [repre-

---

[21] See also *Sheridan* v. *Garrison,* 273 F. Supp. 673, 679 (ED La. 1967), rev'd on other grounds, 415 F. 2d 699 (CA5 1969); Boudin, *supra,* n. 13, at 17; Friendly, The Fifth Amendment Tomorrow: The Case for Constitutional Change, 37 U. Cin. L. Rev. 671, 700 (1968); Meshbesher, *supra,* n. 7, at 190–191, 195–196; Steele, Right to Counsel at the Grand Jury Stage of Criminal Proceedings, 36 Mo. L. Rev. 193, 201 (1971); The Grand Jury, 9 Col. J. L. & Soc. Prob., *supra,* n. 20, at 719; The Supreme Court, 78 Harv. L. Rev., *supra,* n. 20, at 222; Note, 1967 Duke L. J., *supra,* n. 13, at 131–133; Recent Developments, *supra,* n. 19, at 517–518.

sented] by experienced and learned counsel." *Johnson* v. *Zerbst,* 304 U. S., at 462–463; *Schneckloth* v. *Bustamonte,* 412 U. S., at 236.

> "It is said that a witness can protect himself against some of the many abuses possible in a secret interrogation by asserting the privilege against self-incrimination. But this proposition collapses under anything more than the most superficial consideration. The average witness has little if any idea when or how to raise any of his constitutional privileges. . . . [I]n view of the intricate possibilities of waiver which surround the privilege he may easily unwittingly waive it." *In re Groban, supra,* at 345–346 (Black, J., dissenting).

Under such conditions it "would indeed be strange were this Court" to hold that a putative defendant, called before a grand jury and interrogated concerning the substance of the crime for which he is in imminent danger of being criminally charged, is simply to be left to "fend for himself." *Coleman* v. *Alabama, supra,* at 20 (Harlan, J., concurring and dissenting).

It may be that a putative defendant's Fifth Amendment privilege will be adequately preserved by a procedure whereby, in addition to warnings, he is told that he has a right to consult with an attorney prior to questioning, that if he cannot afford an attorney one will be appointed for him, that during the questioning he may have that attorney wait outside the grand jury room, and that he may at any and all times during questioning consult with the attorney prior to answering any question posed. See *United States* v. *Capaldo,* 402 F. 2d 821, 824 (CA2 1968), cert. denied, 394 U. S. 989 (1969); *United States* v. *Pepe,* 367 F. Supp. 1365, 1369 (Conn. 1973).[22]

---

[22] Contra, arguing that the presence of counsel inside the grand jury room is required, Boudin, *supra,* n. 13, at 17; Friendly, *supra,*

At least if such minimal protections were present, a putative defendant would be able to consult with counsel prior to answering any question that he might in any way suspect may incriminate him. Thereafter, if the privilege is invoked and contested, a hearing on the propriety of its invocation will take place in open court before an impartial judicial officer, and the putative defendant will there have his counsel present. *Harris* v. *United States*, 382 U. S. 162, 166 n. 4 (1965); *In re Oliver*, 333 U. S. 257 (1948); *United States* v. *Pepe, supra*, at 1369. If the invocation of the privilege is disallowed, the putative defendant will then have the opportunity to answer the question posed prior to the imposition of sanctions for contempt. *Garner* v. *United States*, 424 U. S., at 663.

There is clearly no argument that a procedure allowing a putative defendant called to testify before a grand jury to consult at will with counsel outside the grand jury room prior to answering any given question would in any way impermissibly "delay and disrupt grand jury proceedings." *United States* v. *Calandra*, 414 U. S., at 349. This is clearly manifested by the plethora of reported instances in which just such procedures have been followed.[23] Nor would such a procedure damage

---

n. 21, at 701; Meshbesher, *supra*, n. 7, at 193; Steele, *supra*, n. 21, at 203; The Grand Jury, 9 Col. J. L. & Soc. Prob., *supra*, n. 20, at 722; Note, 1967 Duke L. J., *supra*, n. 13, at 124–125.

Certainly there is no viable argument that allowing counsel to be present in the grand jury room for purposes of consultation regarding testimonial privileges would subvert the nature or functioning of the grand jury proceeding. Such a procedure is sanctioned by statute in several States. Kan. Stat. Ann. § 22–3009 (1974); S. D. Comp. Laws § 23–30–7 (1975); Utah Code Ann. § 77–19–3 (1975); Wash. Rev. Code § 10.27.120 (1974); Mich. Stat. Ann. § 28:943 (1972) (one-man grand jury).

[23] *E. g., United States* v. *George*, 444 F. 2d 310, 315 (CA6 1971)

the constitutional "role and functions of the grand jury," *ibid.*, for the only effect on its investigative function is to secure a putative defendant's Fifth Amendment privilege and thereby avoid subversion of the adversary system.[24]

It is, of course, unnecessary in this case to define the exact dimensions of the right to counsel since the testimony obtained by the grand jury interrogation was not

---

(right to consult with attorney "after every question"); *United States* v. *Weinberg*, 439 F. 2d 743, 745 (CA9 1971) (right to confer with attorney exercised "after almost every question"); *United States* v. *Capaldo*, 402 F. 2d 821, 824 (CA2 1968), cert. denied, 394 U. S. 989 (1969) (permitted to consult with counsel "whenever he so desired"); *United States* v. *Isaacs*, 347 F. Supp. 743, 759 (ND Ill. 1972) ("provided every opportunity to consult with counsel"); *Application of Caldwell*, 311 F. Supp. 358, 362 (ND Cal. 1970) (permitted to consult with counsel "at any time he wishes"); *United States* v. *De Sapio*, 299 F. Supp., at 440 ("could consult with counsel during the interrogation if he so desired"); *United States* v. *Leighton*, 265 F. Supp., at 37 (right to consult with counsel "at any time he chose"); *United States* v. *Hoffa*, 156 F. Supp., at 512 ("given an opportunity to consult with [his] lawyer"). See also *Levine* v. *United States*, 362 U. S. 610, 611 (1960); *United States* v. *Nickels*, 502 F. 2d 1173 (CA7 1974), cert. pending, No. 74–735; *United States* v. *Daniels*, 461 F. 2d, at 1077; *Perrone* v. *United States*, 416 F. 2d 464, 466 (CA2 1969); *United States* v. *Corallo*, 413 F. 2d, at 1328; *United States* v. *DiMichele*, 375 F. 2d, at 960; *United States* v. *Irwin*, 354 F. 2d, at 199; *Kitchell* v. *United States*, 354 F. 2d, at 720; *United States* v. *Tramunti*, 343 F. 2d 548, 551 (CA2 1965), vacated, 384 U. S. 886 (1966); *United States* v. *Kane*, 243 F. Supp. 746, 753 (SDNY 1965); *United States* v. *Grunewald*, 164 F. Supp, at 641–642.

[24] The availability of counsel to help ensure the meaningful exercise of the constitutional privilege may in some instances "discourage the prosecutor's efforts to acquire privileged information, but it is exactly this effort which the law condemns in recognizing the privilege. To create privileges and at the same time inhibit their effective use is paradoxical indeed." Note, 1967 Duke L. J., *supra*, n. 13, at 125 n. 121.

introduced as evidence at respondent's trial on the charge concerning which he was questioned. I write only to make plain my disagreement with the implication in the plurality opinion that constitutional rights to counsel are not involved in a grand jury proceeding, and my disagreement with the further implication that there is a right to have counsel present for consultation outside the grand jury room but that it is not constitutionally derived and therefore may be enjoyed only by those wealthy enough to hire a lawyer.[25]   I cannot accede to a return to the regime of "squalid discrimination," *Griffin* v. *Illinois*, 351 U. S. 12, 24 (1956) (Frankfurter, J., concurring in judgment), where the justice "a man gets depends on the amount of money he has." *Id.*, at 19 (opinion of Black, J.).   Only recently THE CHIEF JUSTICE reminded us of "the basic command that justice be applied equally to all persons," and further that "the passage of time has heightened rather than weakened the attempts [by this Court] to mitigate the disparate treatment of indigents in the criminal process." *Williams* v. *Illinois*, 399 U. S. 235, 241 (1970).   See *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972); *Tate* v. *Short*, 401 U. S. 395 (1971); *Miranda* v. *Arizona*, 384 U. S. 436 (1966); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963); *Douglas* v. *California*, 372 U. S. 353 (1963); *Griffin* v. *Illinois, supra*.   If indeed there is, as the plurality opinion says, a right to have counsel present outside the door to the grand jury room, it is

---

[25] This appears to me to be the plain implication of the following passage:

"Respondent was also informed that if he desired he could have the assistance of counsel, but that counsel could not be inside the grand jury room.  That statement was plainly a correct recital of the law.  No criminal proceedings had been instituted against respondent, hence the Sixth Amendment right to counsel had not come into play." *Ante,* at 581.

most assuredly in my view everyone's right, regardless of economic circumstance.

"The privilege against self-incrimination secured by the Constitution applies to all individuals. The need for counsel in order to protect the privilege exists for the indigent as well as the affluent. . . . While authorities are not required to relieve the accused of his poverty, they have the obligation not to take advantage of indigence in the administration of justice." *Miranda* v. *Arizona, supra,* at 472.

MR. JUSTICE STEWART, with whom MR. JUSTICE BLACKMUN joins, concurring in the judgment.

The Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury. "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." *Bryson* v. *United States,* 396 U. S. 64, 72 (footnote omitted). See *United States* v. *Knox,* 396 U. S. 77, 82; *Glickstein* v. *United States,* 222 U. S. 139, 142. The respondent's grand jury testimony is relevant only to his prosecution for perjury and was not introduced in the prosecution for attempting to distribute heroin. Since this is not a case where it could plausibly be argued that the perjury prosecution must be barred because of prosecutorial conduct amounting to a denial of due process,* I would reverse the judgment without reaching the other issues explored in THE CHIEF JUSTICE's opinion and in MR. JUSTICE BRENNAN's separate opinion.

---

*Cf. *Brown* v. *United States,* 245 F. 2d 549 (CA8).