829 F.2d 1126
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald A. BRAVERMAN, Defendant-Appellant.
 No. 86-3699
 United States Court of Appeals, Sixth Circuit.
 September 25, 1987.
 
 Before NATHANIEL R. JONES and ALAN E. NORRIS, Circuit Judges, and JULIAN A. COOK, District Judge.*
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Defendant, Ronald A. Braverman, appeals his convictions on six counts of perjury--of knowingly making materially false declarations while testifying under oath before a United States grand jury, in violation of 18 U.S.C. Sec. 1623. Defendant entered conditional pleas of guilty, pursuant to Fed. R. Crim. P. 11, in order to preserve for appeal the trial court's adverse rulings on pretrial motions. The adverse determinations were denials of defendant's motions to dismiss the indictment for failure to charge the crime of perjury, and for ineffective representation by counsel before the grand jury. Defendant was sentenced to a term of imprisonment of one year and one day on each count, to run concurrently, and to consecutive $10,000 fines on each count, for a total fine of $60,000.
 
 I.
 
 2
 In September 1981, defendant was subpoenaed to appear as a witness before a grand jury of the Northern District of Ohio investigating Reuben Sturman for alleged violations of the Internal Revenue Code. Upon receipt of the subpoena, defendant obtained the services of a California attorney, experienced in defending those charged with violating tax laws.
 
 
 3
 The perjury indictment resulted from defendant's testimony before the grand jury on December 2 and 3, 1981. Prior to his giving testimony, the government obtained an order of formal use immunity under 18 U.S.C. Secs. 6002 and 6003. Immunity was conferred upon defendant at the commencement of his appearance on December 2, 1981. He was compelled to give testimony, and was advised by the trial court that he had a right to consult with his attorney outside the grand jury room. At that time the government also made it clear that defendant was not the target of the grand jury's investigation.
 
 
 4
 Defendant's testimony proceeded throughout the afternoon of December 2, during which time it became apparent that it would be impossible for the government to conclude its examination on that day. At the conclusion of the December 2 session of the grand jury, defendant and his California counsel were advised that it would be necessary for defendant to reappear the following day. Because counsel had a conflicting obligation in Los Angeles he could not attend defendant's second day of testimony. A member of the local bar, who was a tax attorney and had little experience in criminal defense matters, was retained by defendant as substitute counsel. This local attorney met with defendant and his California counsel and they briefly discussed the matters under investigation, and defendant's immunity.
 
 
 5
 On December 3, local counsel sought to reschedule defendant's appearance before the grand jury, but the government objected on the ground that he had been granted immunity and would not be exposed to prosecution as a result of his testimony. The government continued its questioning. Although his California counsel had returned to Los Angeles, defendant was able to consult with him on one occasion, by telephone, during this second day of testimony.
 
 
 6
 On March 7, 1984, defendant was indicted on seven counts of perjury. Count Two of the indictment was dismissed by the trial court, pursuant to the government's stipulation that it failed to satisfy the standards enunciated by this court in United States v. Eddy, 737 F.2d 564 (6th Cir. 1984). Part C of Count Five of the indictment was also dismissed by the trial court since the government had not amended it to accurately reflect the grand jury testimony given by defendant.
 
 II.
 
 7
 We consider first defendant's assertion that his sixth amendment right to counsel was violated because he was not 'effectively' represented by his California lawyer, who was absent during part of his testimony and who failed to advise him of his right of recantation following that testimony. He also contends that, under the totality of circumstances, including his retention of local counsel who admittedly was inexperienced and was unable to render meaningful advice, due process requires that statements made before the grand jury be suppressed. In essence, then, defendant claims that he received ineffective assistance of counsel when he appeared before the grand jury, and that this requires reversal of his convictions.
 
 
 8
 It is a well-settled principle of constitutional law that the guarantee of the right to counsel found in the sixth amendment attaches when adversarial judicial proceedings have been instituted against an individual. Powell v. Alabama, 287 U.S. 45 (1932).
 
 
 9
 For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.
 
 
 10
 Kirby v. Illinois, 406 U.S. 682, 689 (1972).
 
 
 11
 Further, the Supreme Court has held that a witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by counsel. In re Groban, 352 U.S. 330, 333 (1957). A witness may, however, have counsel available to him outside the grand jury room; the witness does have the right to leave the room to consult with his attorney during questioning. United States v. Mandujano, 425 U.S. 564, 581 (1976);[1] United States v. George, 444 F.2d 310, 314 (6th Cir. 1971).
 
 
 12
 No criminal proceedings had been instituted against defendant at the time he appeared before the grand jury. Hence, the sixth amendment right to counsel had not come into play. Kirby, 406 U.S. at 689-90; Mandujano, 425 U.S. at 581. As noted previously, defendant was advised by the trial judge that he had the right to consult with his attorney. He was given adequate opportunity to exercise that privilege once the questioning began. Even if he had a sixth amendment right to counsel there is no merit in defendant's assertion that his right under the amendment was violated when, after consulting with an attorney outside the grand jury room, he returned to give perjurious testimony. Neither the sixth amendment right to counsel, nor the fifth amendment privilege against self-incrimination, provide protection for the commission of perjury. 'Our system provides methods for challenging the government's right to ask questions--lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.' Bryson v. United States, 396 U.S. 64, 72 (1969). Accordingly, we reject the view of the sixth amendment right to counsel urged upon us by defendant and find nothing in the record to preclude his conviction under its provisions.
 
 
 13
 We find equally without merit defendant's contention that under the totality of circumstances his conviction must be overturned because it was not in accordance with due process of law. Defendant's false testimony was not 'induced by government tactics or procedures so inherently unfair under all the circumstances as to constitute a prosecution for perjury a violation of the Due Process Clause of the Fifth Amendment.' United States v. Mandujano, 425 U.S. at 585 (Brennan, J., concurring [footnote omitted]); see also United States v. Brown, 666 F.2d 1196, 1199 (8th Cir. 1981), cert. denied, 457 U.S. 1108 (1982). Defendant does not contend that he was counseled to give false testimony, nor does he demonstrate how effective assistance of counsel outside the grand jury room would have led him to tell the truth.
 
 III.
 
 14
 We next consider whether the questions and answers from the grand jury proceedings which were set out in the indictment, when compared with the portion of the indictment setting out the truth of the matters inquired into, were sufficient as a matter of law to support the conviction for perjury.
 
 
 15
 Defendant was charged with making a false declaration before the grand jury: '(a) Whoever under oath . . . in any proceeding before . . . any . . . grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.' 18 U.S.C. Sec. 1623.
 
 
 16
 Defendant contends that the indictment charged him with perjury by implication. It is true that the statute does not make it a crime for a witness to knowingly make a material declaration from which one might imply a material fact that is false. Bronston v. United States, 409 U.S. 352 (1973); United States v. Eddy, 737 F.2d at 569. In Bronston, the witness was asked if he had any bank accounts in Swiss banks, and he truthfully answered 'no' (his personal Swiss bank account had by then been closed). He was then asked, 'Have you ever?,' and he responded, 'The company had an account there for about six months, in Zurich.' Bronston v. United States, 409 U.S. at 354. That answer was literally true but, of course, misleading since the witness had maintained his own Swiss account in the past. A unanimous Supreme Court held that a prosecution for perjury does not lie for an answer that is literally true but unresponsive to the question asked, even where the witness intended the questioner to be misled, and where the answer, by negative implication, was false.
 
 
 17
 Furthermore, because the essence of the crime is the knowledge of the witness that his testimony is false, where the question propounded to him admits of several plausible meanings the witness' knowledge cannot be adequately tested. See United States v. Wall, 371 F.2d 398, 400 (6th Cir. 1967). The question propounded to a witness must be parsed to determine if it was readily susceptible of a responsive reply, and if it adequately tested the witness' belief in the veracity of his answer.
 
 
 18
 We have carefully reviewed the language of the indictment charging the six counts of which defendant was convicted and, as to the first, third, and sixth counts, are of the opinion that they did not charge defendant with perjury by implication but, instead, were sufficient, as a matter of law, to support a conviction under 18 U.S.C. 1623.
 
 
 19
 In its fourth count, the indictment alleged that defendant testified falsely as follows:
 
 
 20
 Q. Have you ever handled any sort of financial transactions for Reuben Sturman?
 
 
 21
 A. Outside of minor personal ones, no.
 
 
 22
 Q. What do you consider minor?
 
 
 23
 A. I'm talking about something under a few hundred dollars, like, you know, when he saw something he couldn't get it, I would purchase it for him.
 
 
 24
 I know I bought him some cigars a couple of times, and everyone [sic] of these personal things have always been reimbursed.
 
 
 25
 The indictment then went on to allege that defendant knew that testimony was false since 'he in fact was involved in a financial transaction involving Reuben Sturman's loan of $100,000 to Gerry Stockton.' The phrase 'handled any sort of financial transactions for' Sturman is less than precise, and suggests various interpretations. Certainly, one may be involved with another in a financial transaction without handling it for him. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry. Bronston v. United States, 409 U.S. at 360. Because the questions and answers, especially when considered in the context of the truth alleged by the government in the indictment, were too ambiguous to test either the truth of the answers, or of defendant's knowledge of their falsity, the trial court erred in not dismissing Count Four.
 
 
 26
 Count Five alleged that the following testimony was false:
 
 
 27
 Q. Now, you mentioned before that you did have some Swiss bank accounts?
 
 
 28
 A. Yes.
 
 
 29
 Q. Did you have more than one?
 
 
 30
 A. No.
 
 
 31
 Q. What bank did you have the account in in Switzerland?
 
 
 32
 A. I think it's at the Swiss Credit Bank?
 
 
 33
 Q. Where is that located?
 
 
 34
 A. Switzerland, in Zurich.
 
 
 35
 Q. So when you went to handle transactions with your Swiss bank account, you would go to Zurich?
 
 
 36
 A. Oh, yes.
 
 
 37
 Q. Do you still maintain that account?
 
 
 38
 A. Yes.
 
 
 39
 . . ..
 
 
 40
 Q. All right. How much money do you have in your Swiss bank account currently?
 
 
 41
 A. Somewhere around $200,000.
 
 
 42
 Q. That is currently being replenished by profits from Vending B.V.; is that correct?
 
 
 43
 A. Yes.
 
 
 44
 . . ..
 
 
 45
 Q. Is it fair to say that you have then maintained all of the money that you received from Stonerealm from the skim?
 
 
 46
 A. Yes.
 
 
 47
 Q. Is all that money still in your Swiss account?
 
 
 48
 A. Well, you spend a lot of it, but the majority was there at one time. If we are talking about the '74, '75 time frame, the money was still there. Its [sic] no longer.
 
 
 49
 Q. We are.
 
 
 50
 A. But the bulk of it is no longer.
 
 
 51
 Q. If we are going to cover the period 1974 through 1981, when the skim ceased--is that fair to say?
 
 
 52
 A. '79, '80.
 
 
 53
 . . ..
 
 
 54
 Q. Now, where specifically did you get the money for the downpayment? [sic]
 
 
 55
 A. From my Swiss account.
 
 
 56
 Q. Was that--that was a lump sum withdrawal?
 
 
 57
 A. Right.
 
 
 58
 Q. Did you personally go to Switzerland and withdraw the money?
 
 
 59
 A. I believe I did, and I sent it over in check form.
 
 
 60
 Q. You sent a check to Mr. Sturman?
 
 
 61
 A. Yes, but it was not in cash.
 
 
 62
 Q. You wire transferred?
 
 
 63
 A. No. It was like a cashier's check, a bank check.
 
 
 64
 Q. For $75,000 payable to whom?
 
 
 65
 A. Teddy Marche.
 
 
 66
 . . ..
 
 
 67
 Q. What bank did you draw the cashier's check on for the down payment?
 
 
 68
 A. I would imagine the Swiss Credit Bank.
 
 
 69
 Q. Was it the Swiss Credit Bank, or are you guessing it was?
 
 
 70
 A. I would say that's where my account was. That's where I would have drawn it.
 
 
 71
 This was said to be false since defendant knew (A) that he once had two other Swiss accounts; (B) that the account had been closed and had a zero balance; [Part (C) of Count Five was dismissed by the district court]; (D) that '[c]ontrary to the Defendant's testimony . . . that from 1974 to 1980 or 1981 he deposited all of the skim money from Stonerealm Ltd. into his account at the Swiss Credit Bank, no such deposits were ever made into that account'; and (E) that contrary to his testimony that he had withdrawn $75,000 from his Swiss account to use as a down payment, no such withdrawal was made.
 
 
 72
 The problem with Part (D) of Count Five is that the questions and answers are too vague and ambiguous to support the government's allegation that defendant testified that he had deposited all of the skim money into his account at the Swiss Credit Bank. Accordingly, Part (D) should have been dismissed. We do, however, conclude that the questions and answers grounding Part (E) are sufficient to ground that charge since defendant, in the beginning of that excerpt of testimony, precisely identified the source of the down payment as his Swiss bank account. Had the latter part of the testimony been the only exchange relied upon by the government, it could not have supported the charge since it is unclear whether the witness was being asked for the source of the $75,000, or of the bank upon which a cashier's check was drawn. However, even if Part (E) as well as Part (D) had been dismissed, Parts (A) and (B) were sufficient to support a conviction, and the trial court's judgment of conviction under Count Five would therefore not be disturbed.
 
 
 73
 The seventh count pointed to this testimony as false:
 
 
 74
 Q. Tell us how you capitalized Health Devices?
 
 
 75
 . . ..
 
 
 76
 A. . . . [W]hat I did, is a lot of the money that I had made over those previous years and had put into Swiss accounts and had put into Dutch accounts and so on, I started transferring back to the United States, I started bringing back to the United States in cashier's checks and so on. I brought it back in cash, I brought it back however I could, and I kept investing it into the business as the business needed it, and there was a total capitalization of somewhere between five and six hundred thousand that I subsequently put into the business.
 
 
 77
 . . ..
 
 
 78
 Q. Were you the sole source of bringing the money into the country?
 
 
 79
 A. No. I once asked Mr. Marle to bring some money and Mr. Geerts.
 
 
 80
 Q. How much money did Mr. Marle bring into the country?
 
 
 81
 A. I believe together they brought in about $100,000.
 
 
 82
 Q. Would that have been in cash?
 
 
 83
 A. Yes.
 
 
 84
 Q. Did they obtain that money from your Swiss bank account?
 
 
 85
 A. Yes. I had it withdrawn for them and given to them.
 
 
 86
 The indictment went on to say that this was false because defendant knew that 'Health Services was not capitalized with currency withdrawn from MR. BRAVERMAN'S Swiss account.'
 
 
 87
 Although in the earlier part of his testimony defendant identified 'Swiss accounts' and 'Dutch accounts and so on' as the location of the money which he started transferring back to the United States, in the latter part of his testimony he unequivocally identified the source of the money brought into the United States by Messrs. Marle and Geerts as his Swiss bank account. There being no ambiguity in that testimony, defendant's contention is not well-taken; as to that portion of the capitalization, defendant said it was withdrawn from his Swiss bank account.
 
 
 88
 The judgment of the district court is affirmed in part and reversed in part, and this cause is remanded to the district court with instructions to modify its judgment and sentence in a manner consistent with this opinion.
 
 
 
 *
 Hon. Julian A. Cook, Jr., United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 A four-justice plurality of the Court, Chief Justice Burger, Justices White, Powell, and Rehnquist, 425 U.S. at 581, suggested that a grand jury witness has no right to counsel whatever. Justices Marshall and Brennan concurred in the result but took issue with the plurality's broad proscription, arguing that a grand jury witness is entitled to some degree of assistance from counsel. 425 U.S. at 602-09 (Stewart and Blackmun, JJ., concurring, 425 U.S. at 609). It is noteworthy that the concurrence of Justices Marshall and Brennan argued for extension of the right to counsel to include a witness who is testifying before the grand jury based upon the need to protect that witness' fifth amendment right against self-incrimination. In this case, defendant had been bestowed with use immunity; thus, the rationale for extension of the right to counsel had therefore been diminished by his having attained the prosecutorial immunity status. At best, the need for protection under the sixth amendment right to counsel appears to have attenuated significantly. See Matter of Lowry, 713 F.2d 616, 618 n.4 (11th Cir. 1983)