**Harold J. McCOY, III, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Nos. CIV. A. 97–7552, CRIM. A. 95–116–1.**

United States District Court, E.D. Pennsylvania.

April 28, 2000.

Christopher R. Hall, Anthony J. Wzorek, U.S. Atty's Office, Philadelphia, PA, for U.S.

Michael D. Shepard, Blank, Rome, Comisky & McCauley, Philadelphia, PA,

Thomas Colas Carroll, Philadelphia, PA, Mark E. Cedrone, Carroll & Cedrone, Philadelphia, PA, for Defendant.

Harold McCoy, Oakdale, LA, pro se.

## MEMORANDUM

ROBRENO, District Judge.

On July 10, 1995, petitioner Harold J. McCoy, III, pleaded guilty to a two-count superseding indictment charging him with conspiracy to interfere with interstate commerce by robbery and interference with interstate commerce commit by robbery in violation of 18 U.S.C. § 1951 (The Hobbs Act). On May 30, 1996, the court sentenced McCoy to 126 months imprisonment, three years supervised release, restitution of $5,000, and a special assessment of $100.[1]

On June 11, 1997, this court further reduced McCoy's term of imprisonment to 102 months after considering the Government's motion to reduce McCoy's sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. The Third Circuit Court of Appeals affirmed the conviction and sentence.

On December 15, 1997, McCoy, acting pro se, filed the instant motion pursuant to 28 U.S.C. § 2255 to vacate the judgment of conviction and sentence. It is the essence of McCoy's argument that his counsel was ineffective for failing to explain to him the full effect of his guilty plea. Upon review of the record and after an evidentiary hearing, the court will deny McCoy's motion finding that counsel was not ineffective because McCoy's guilty plea was sufficiently informed and voluntary.

1. The appropriate sentencing range for McCoy was 168 to 210 months imprisonment. The court granted the Government's motion pursuant to U.S.S.G. § 5K1.1, and departed from that range, imposing a sentence of 126 months imprisonment.

2. Despite the fact that it appears that McCoy's counsel, in his proposed findings of facts and

## I. INTRODUCTION

McCoy bases his instant motion upon the following summarized grounds:

(1) counsel rendered ineffective assistance by failing to inform defendant about the ramifications of signing the plea agreement, failing to move for suppression of testimony before the grand jury, failing to challenge the plea agreement after learning that the Government allegedly had petitioner sign it without the benefit of counsel, and failing to inform the court that an agreement was allegedly made between defendant and the Government on February 22, 1995;

(2) that the Government violated his Fifth and Sixth Amendment rights by meeting with petitioner without the presence of his counsel; and

(3) that the Government violated his Fifth Amendment rights by using the February agreement, compelling petitioner to make incriminating statements, and then not honoring it.

See Petition at 5, attached Mem. at ii. After numerous subsequent pro se filings, the court appointed counsel to represent McCoy in this matter. Limited discovery was conducted and an evidentiary hearing was held, after which the parties were instructed to file supplemental submissions, that is, proposed findings of fact and conclusions of law.[2] This memorandum represents the court's findings of fact and conclusions of law.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On January 12, 1995, a complaint and warrant were issued against McCoy and three others charging McCoy with conspiracy to commit robbery and the commission of a robbery of a Texas jewelry store. At

conclusions of law, only addresses McCoy's claim that his counsel was ineffective for not informing him of the ramifications his signing a plea agreement would have on the protections previously given in the February 22, 1995 proffer agreement, the court has considered McCoy's additional claims as well.

that time, the Government was aware of McCoy's involvement in three jewelry store robberies, one of which was the Texas store. After McCoy's initial appearance, the court appointed Michael D. Shepard, Esquire, to represent McCoy. McCoy and Shepard met several times in the month of February, 1995 to discuss his case. On or about February 22, 1995, McCoy entered into a proffer agreement with the Government (the "February 22, 1995 agreement" or the "proffer agreement") that stated, in pertinent part:

> First, no statements made by you or your client, or other information provided by you or your client during the "off-the-record" proffer, will be used directly against your client in any criminal case.

See Appendix to Petitioner's Supp. Mem. in Support of § 2255 Mot. [hereinafter "App."] at 253. The proffer agreement was signed by McCoy, Shepard, and the Assistant United States Attorney ("AUSA") on the case at that time, Christopher R. Hall. Id. at 254. Shepard explained that, at that time:

> I told Mr. McCoy that any statements he makes to the Government pursuant to this proffer agreement won't be used against him directly in any criminal case. If he went to trial, they could not use that information against him. However, I also explained to him that—because the Government would not agree to it, that any information, if we're going to go along this route for cooperation and entering into a plea agreement, he's going to be a cooperating witness, that the Government will use the information to calculate the sentencing guidelines.

Evidentiary Hearing Tr. 3/16/99 at 12. Shepard testified that he told McCoy this

information on or about February 22, 1995 and that he also touched upon that subject when he first met with McCoy at prison earlier in February of 1995.[3] Id. Shepard generally took notes and created memoranda for the file regarding his conversations with McCoy. See App. 144–47, 153–237, 246–49. However, none of Shepard's notes or memoranda regarding those conversations occurring prior to McCoy's entry of a guilty plea reflects Shepard's having discussed with McCoy that his statements at the proffer could be used against him at sentencing. See App. 246–249, 208–28.

McCoy then attended at least three debriefing sessions throughout the months of February and March in which he provided the Government with information regarding a spree of approximately ten smash-and-grab jewelry store robberies in various states committed by him and several other individuals.[4] On March 9, 1995, the grand jury returned an indictment against McCoy and three other individuals, charging McCoy with one count of interference with interstate commerce by robbery.

Prior to April 27, 1995, Hall and Shepard discussed the idea of McCoy pleading guilty and cooperating with the Government by appearing before the grand jury. See Evidentiary Hearing Tr. 3/16/99 at 16, 43. Subsequent to those discussions, Hall informed Shepard that the grand jury was scheduled to convene on April 27, 1995 and that he would like McCoy to testify before it on that date pursuant to signing a guilty plea agreement. Id. Shepard informed Hall that he would be out of the country on the date the grand jury was to convene. Hall and Shepard then agreed that Hall would fax Shepard the proposed plea

**3.** Shepard testified that although he did not mention U.S.S.G. § 1B1.8, which restricts the Government's use of incriminating information when it has entered into a cooperation agreement with a defendant, to McCoy, he had discussed the concept with McCoy. Evidentiary Hearing Tr. 3/16/99 at 35–36; see n. 7, infra, for the text of U.S.S.G. § 1B1.8. Shepard also testified that "[w]hen Mr. McCoy signed the proffer agreement and Mr.

Hall ... informed us what the deal would be at both times, it was stated by Mr. Hall that all crimes would be included in the calculation of the sentencing guidelines." See Evidentiary Hearing Tr. 3/16/99 at 21.

**4.** McCoy also provided the Government with the names of additional participants who had not been included in the original complaint and warrant.

agreement as soon as it was internally approved by the United States Attorney's office and that Shepard's secretary would forward it to Shepard, at his vacation location. *Id.* at 44. Pursuant to Shepard's and Hall's agreement, if Shepard disagreed with any part of, or had concerns about, the proposed plea agreement, Shepard would contact Hall, inform Hall that he had a problem, and McCoy's signing of the agreement and his testimony before the grand jury would be postponed until Shepard returned from vacation and could address the problem. *Id.* at 44–45. Otherwise, McCoy could sign the agreement in Shepard's absence and then proceed to testify before the grand jury. *Id.*

Because Shepard had previously discussed with McCoy the basic terms of a "standard" cooperating plea agreement and what terms would most likely be in McCoy's plea agreement throughout the month of March and shortly before leaving on vacation, Shepard informed McCoy of the arrangement Shepard had made with Hall. *Id.* at 16–19. Shepard told McCoy that McCoy had the right to have counsel outside the grand jury room. *Id.* at 43. McCoy agreed that Shepard's presence was not necessary when he signed the plea agreement or when he testified before the grand jury.[5] *Id.*

On April 26, 1995, as agreed between Hall and Shepard, Hall faxed the plea agreement to Shepard's office. Shepard's secretary then read the seven-page, ten-paragraph agreement over the phone to Shepard, who by that time was out of the country. *Id.* at 44. Finding the plea agreement to be acceptable and in accordance with the terms he had previously discussed with Hall and verbally conveyed to McCoy, Shepard did not communicate any concerns to Hall. Thus, on April 27, 1995, in Shepard's absence, Hall presented McCoy with the plea agreement, which McCoy signed.[6] The plea agreement provided that:

> The defendant agrees to plead guilty to a Superseding Indictment charging him with one count of conspiracy to interfere with interstate commerce by robbery and one count of interference with commerce by robbery, both in violation of Title 18, United States Code, Section 1951, arising from McCoy's participation in a string of ten "smash and grab" robberies between 1991 and 1994 which victimized jewelry stores in Pennsylvania, Connecticut, New Jersey, Maryland, Virginia, North Carolina, and Texas and netted McCoy and his gang Rolex and other name brand watches with a retail value greater than $700,000.

*See* Guilty Plea Agreement (doc. # 177) at 1. As is evident from its face, the plea agreement clearly articulates McCoy's involvement in not three but ten jewelry store robberies. The plea agreement did not contain any language limiting the use of the information that McCoy had provided in the off-the-record proffers.[7] The last

---

**5.** The court finds incredible McCoy's testimony at the evidentiary hearing that he had no idea that he was going to be pleading guilty, signing a plea agreement, or testifying before the grand jury until he was actually presented with the plea agreement on April 27, 1995.

**6.** At the evidentiary hearing, Hall informed the court that in his eight years as an AUSA, he had never executed a plea agreement with a defendant in the absence of the defendant's counsel. *See* Evidentiary Hearing Tr. 3/16/99 at 101, 104.

**7.** Such language typically falls under the auspices of U.S.S.G. § 1B1.8, which states:
(a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.
(b) The provisions of subsection (a) shall not be applied to restrict the use of information:
(1) known to the government prior to entering into the cooperation agreement;
(2) concerning the existence of prior convictions and sentences in determining § 4A1.1 (Criminal History Category) and § 4B1.1 (Career Offender);

paragraph of the plea agreement states, "It is agreed that no additional promises, agreements or conditions have been entered into other than those set forth in this document...." *Id.* at 6–7. Of note, the plea agreement did not contain any reference to an apparent understanding between the Government and the defense that the federal authorities would communicate the fact of McCoy's federal prosecution to the state authorities with the expectation that, as a result, McCoy would not be subject to state prosecution as well—an understanding which both Hall and Shepard acknowledged existed.[8] *See* Evidentiary Hearing Tr. 3/16/99 at 21–23; 117–21.

Hall testified that although he did not recall if McCoy had any questions about the plea agreement prior to signing it, he was sure that if McCoy "had any unresolved questions at the end of our discussion, we would have either called—we would have called his attorney and if we had not been able to reach his attorney, we would have not—I would not have had him sign...." *Id.* at 105. Hall further testified that section 1B1.8 was never a viable option in McCoy's case and that every time Hall discussed section 1B1.8 with Shepard, Hall refused to make it available to McCoy. *Id.* at 123–125.

Immediately after signing the plea agreement, McCoy appeared before the grand jury. At the grand jury proceeding, Hall advised McCoy of his right not to incriminate himself under the Fifth Amendment, confirmed that McCoy had reviewed the plea agreement in its entire-

(3) in a prosecution for perjury or giving a false statement;
(4) in the event there is a breach of the cooperation agreement by the defendant; or
(5) in determining whether, or to what extent, a downward departure from the guidelines is warranted pursuant to a government motion under § 5K1.1 (Substantial Assistance to Authorities). U.S.S.G. § 1B1.8. Hall testified that the plea agreement with McCoy would never have included section 1B1.8 language because of department policy with respect to gang robberies (i.e., the Government could obtain the same information from another member of

ty, and asked McCoy whether he understood that he had agreed to plead guilty to counts one and two of a superseding indictment, which the grand jury may return in the case. *See* Grand Jury Tr. 4/27/95 at 3–5. Further, Hall confirmed that McCoy had agreed "to come in and in fact incriminate yourself here today by telling the Grand Jury about your involvement in a spree of ten robberies of jewelry stores." [9] *Id.* at 3. Hall also informed McCoy of his right to counsel under the Sixth Amendment, recognized that McCoy's attorney (Shepard) was on vacation, and instructed McCoy to inform him if McCoy wanted to stop, "[b]ecause we don't want you to go ahead, if you want to have your lawyer." *Id.* at 6. It is undisputed that the testimony McCoy then provided to the grand jury mirrored that which he had previously provided to the Government in his proffer sessions.

Later that same day, the grand jury returned a superseding indictment against McCoy and seven other individuals, charging McCoy with one count of conspiracy to interfere with interstate commerce and one count of interference with interstate commerce. The superseding indictment detailed all the "smash and grab" robberies which McCoy had discussed in his proffer sessions and to which he had testified before the grand jury.

On July 10, 1995, this court held a hearing to consider McCoy's offer to change his plea. At the hearing, the court learned that Shepard had not been present at the time McCoy had signed the April 27, 1995

the gang), *see* Evidentiary Hearing Tr. 3/16/99 at 107–09, and because McCoy was receiving the benefit of not being prosecuted by the individual state authorities for the robberies in addition to his federal prosecution. *See id.* at 116.

8. McCoy was not prosecuted by the state authorities.

9. McCoy testified that, similar to his proffer sessions, he believed that the February 22, 1995 agreement protected his testimony before the grand jury despite Hall's comments. *See* Evidentiary Hearing Tr. 3/16/99 at 64.

plea agreement. *See* Change of Plea Tr. 7/10/95 at 8. Shepard assured the court that he had reviewed the written agreement with McCoy several times after McCoy had signed it and that he had discussed the terms of it with McCoy prior to McCoy's signing it. *Id.* at 9.

The court then asked Mr. McCoy whether all his questions had been answered at the time he signed the agreement. *Id.* When McCoy responded, "More or less," the court adjourned the proceeding and directed Shepard and McCoy to review "every line" of the agreement so that McCoy was completely satisfied that its terms were acceptable.[10] *Id.* at 9–10. After a period of several hours, Shepard reported to the court that he and McCoy "would like to move forward" and that he "appreciate[d] the Court's indulgence in allowing [him] to take the time with [his] client." *Id.* at 10–11. McCoy then proceeded to enter his guilty plea to the superseding indictment.[11] Specifically, when the court asked McCoy, Shepard, and AUSA Anthony J. Wzorek, who covered McCoy's change of plea hearing for Hall

due to scheduling conflicts,[12] if there were any agreements other than those specified in the written plea agreement, all three advised the court that there were none. *Id.* at 22–23. Neither Shepard or McCoy nor Hall brought to the court's attention the "agreement" that the federal authorities would contact the state authorities to inform them that McCoy was being federally prosecuted with the expectation that notice of McCoy's federal prosecution would dissuade the state authorities from prosecuting McCoy for the same conduct. Finding McCoy's plea knowing and voluntary based on the record before it, this court accepted McCoy's change of plea, ordered the preparation of a presentence investigation report ("PSI"), and set a sentencing date.

On October 25, 1995, Shepard wrote a letter to the probation officer in charge of McCoy's case, in which he stated, "The attached proffer letter ... demonstrates that the government agreed that self-incriminating information provided pursuant to the agreement would not be used against McCoy."[13] *See* App. at 588. Ad-

---

10. McCoy testified at the evidentiary hearing that during the recess, he asked Shepard about the proffer's protections. *See* Evidentiary Hearing Tr. 3/16/99 at 67. According to McCoy, as a result of that question, Shepard left the room for a period of time, returned shortly thereafter, and then acted as if he had obtained section 1B1.8 protection from the Government. McCoy admitted, however, that Shepard "didn't just come out and say, yeah, well, [the AUSA] just told me this. [Shepard] said, you know everything cool. Don't worry about it." *Id.* at 70. McCoy also testified that he never knew what section 1B1.8 was until that time. *Id.*

11. During his deposition prior to the evidentiary hearing, the notes of which have been made part of the record in this case, Shepard was asked if he ever explained to McCoy that whatever protections applied to the proffer sessions would not apply to McCoy's grand jury testimony. *See* App. at 453. Shepard answered that he believed that he did explain that to McCoy, "perhaps at the March 30 conference [one of the proffer sessions] as well as on the phone" and that he "certainly discussed it later at the plea hearing, change of plea hearing, and at other times." *Id.* at 454. Shepard further testified that he did not

recall discussing U.S.S.G. § 1B1.8 during the recess in the change of plea hearing because section 1B1.8 was not in the plea agreement and because he had previously told McCoy "that all of the robberies of which [McCoy] told [the Government] about, and the dollar amount that was [sic] going to be used against him at sentencing." *Id.* at 457. Simply because Shepard did not specifically refer to "section 1B1.8" does not mean that McCoy was unaware that all the robberies would be considered at sentencing.

12. AUSA Wzorek was part of a team of AUSAs handling the prosecutions of the members of McCoy's gang. *See* Evidentiary Hearing Tr. at 108. Wzorek eventually assumed responsibility for McCoy's case. *Id.* at 122.

13. At the evidentiary hearing, Shepard explained the genesis of this objection:

> [I]n attempting to come up with other ways to get a better sentence, and to this day I think it was quite creative, [in approximately August of 1995] both Harold and I came up with the idea of, well, why don't we say that the proffer agreement is a cooperation agreement and see if we can't get Judge

ditionally, McCoy formally submitted objections to the PSI, opposing the enhancement of his base offense level due to his participation in all the robberies which he had admitted during his proffer and before the grand jury, but for which he had not been indicted. At the sentencing hearing, McCoy argued to this court, as he did to the Probation Office, that the February 22, 1995 agreement constituted a cooperation agreement pursuant to U.S.S.G. § 1B1.8, which protected him from having his sentence increased based on that information. Specifically, McCoy, through Shepard, stated in McCoy's Sentencing Memorandum that:

> However, both counsel for the Government and Mr. McCoy clearly understood that the terms of the 2/22 Agreement governed the time that Mr. McCoy provided all of the incriminating information which is now being used against him.

*See* Def.'s Sentencing Mem. at 8. McCoy went on to state in his sentencing memorandum, "In the instant case, the plea agreement cannot be considered without the 2/22 Agreement. Therefore, the only fair and reasonable reading of Mr. McCoy's cooperation with the Government is that the Government would not use

Robreno to agree to that as well and see if we can't push the law in that direction. And we gave it the old college try, but it didn't work. Tried it in the Third Circuit too, and it didn't work.

Evidentiary Hearing Tr. 3/16/99 at 35. Shepard had again communicated this argument to the probation office as is evident in a memorandum he wrote to the file dated March 11, 1996, which states in relevant part:

> I explained to [the Probation Officer] that Harold cooperated under a proffer letter from the Government which provided that no information he provided would be used against him in a criminal case. After Harold began cooperating, other defendants began to fold. Harold met approximately half a dozen times with the Government. Prior to going into the grand jury, Harold signed his plea agreement. Therefore, the Government already had all of the information under the proffer agreement which provided that no information that Harold provided would be used against him in any criminal case.

statements or information he provided against him in the criminal case, at sentencing or otherwise." *Id.* at 9.

This court overruled McCoy's objections, finding that, at the change of plea hearing, McCoy replied "No" when the court asked him if he had entered into any agreement other than that which had already been stated on the record. Sentencing Tr. 5/30/96 at 30. Moreover, this court took notice that both counsel for the Government and for the defense also stated at the change of plea hearing that there were no other agreements aside from the plea agreement that had been placed on the record. *Id.* Thus, the court found McCoy bound by the terms of his plea agreement, which detailed a string of ten "smash and grab" robberies. *Id.* Based on the findings of fact contained in the PSI and after granting McCoy a downward departure under U.S.S.G. § 5K1.1, the court sentenced McCoy to 126 months in custody.

McCoy appealed his sentence to Third Circuit, raising, *inter alia*, the same issue, i.e., that the February 22, 1995 proffer agreement was a cooperation agreement subject to the terms of section 1B1.8.[14] The Third Circuit rejected that argument, find-

*See* App. at 188.

14. In a letter to McCoy dated September 27, 1996, (apparently during the process of drafting the appeal papers), Shepard wrote,

> As you are well aware, there were no other agreements with regard to your plea agreement. The proffer agreement was separate and apart from the plea agreement. However, the argument that we are now making to the Court of Appeals, and made to the District Court previously, is that no statements which you made pursuant to the proffer agreement leading to the superseding indictment can be used against you because all of the incriminating information was tied into information which you provided to the Government about the wrongdoing of others. Therefore, under § 1B1.8, the information ought not to be used against you. It really is irrelevant to your plea of guilty to the crimes. Your intimation that Judge Robreno was somehow mislead is incorrect.

*See* App. at 27.

ing that the plea agreement did not contain any language limiting the use of the information that McCoy had provided in the off-the-record proffers, and, even if section 1B1.8 initially had applied, the plea agreement and the actions which thereafter took place superseded the February 22, 1995 letter, rendering section 1B1.8 irrelevant. *United States v. McCoy*, 107 F.3d 9 (3d Cir.1997).

In his instant motion and at the evidentiary hearing, McCoy argues that his prior counsel provided ineffective assistance. Specifically, McCoy claims that his prior counsel never explained to him that a consequence of signing the plea agreement and testifying before the grand jury about his involvement in the other robberies would be that his admitted participation in all ten robberies would be factored into McCoy's sentencing. In other words, McCoy argues that when he signed the plea agreement and testified before the grand jury, and then resigned the plea agreement in July of 1995, McCoy mistakenly believed, due to counsel, that the February 22, 1995 agreement was still in effect. Moreover, McCoy contends that by having him sign the plea agreement and testify before the grand jury without the presence of a lawyer, the Government violated his Fifth and Sixth Amendment rights.

**15.** As an initial matter, the court rejects McCoy's argument that the Government violated his Fifth and Sixth Amendment rights by having him testify before a grand jury without the presence of counsel. *See Conn v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 1296, 143 L.Ed.2d 399 (1999) (stating that "[a] grand jury witness has no constitutional right to have counsel present during the grand jury proceeding, *United States v. Mandujano*, 425 U.S. 564, 581, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), and no decision of this Court has held that a grand jury witness has a right to have her attorney present outside the jury room[,]" although finding it unnecessary to decide issue). In addition, Hall informed McCoy that if at any point he wished to speak with counsel, he would be allowed to do so. Hall also advised McCoy that he had the right not to incriminate himself.

## III. LEGAL STANDARD

 Section 2255 of title 28 permits a prisoner in custody under sentence of a federal court to move the court to correct an erroneous sentence. "Section 2255 does not afford a remedy for all errors that may be made at trial or at sentencing." *United States v. Essig*, 10 F.3d 968, 977 n. 25 (3d Cir.1993). The United States Supreme Court has read the statute to provide four grounds on which relief may be claimed: (1) the sentence was imposed in violation of the Constitution or the laws of the United States; (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack." *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962).

## IV. DISCUSSION

McCoy now attacks his sentence by asserting that his former counsel was ineffective for allowing him to make an uninformed and involuntary guilty plea.[15] Typically, a defendant who claims that his guilty plea was uniformed and involuntary is requesting to proceed to trial. The procedural posture of this case is slightly different because as relief, McCoy does not wish to withdraw his guilty plea, but rather seeks to be resentenced without the

Moreover, McCoy has offered no evidence that Hall did not believe that Shepard had previously discussed with McCoy the fact that Shepard would not be in the country when McCoy met with Hall to sign the plea agreement. Accordingly, although the court believes such a practice to be unwise, the court finds that the Government did not violate McCoy's Fifth or Sixth Amendment rights by having McCoy sign the plea agreement in the absence of his attorney. Likewise, McCoy has offered no evidence demonstrating that the Government was affirmatively misrepresented the extent of the protections of the proffer agreement or that the Government was aware that Shepard had allegedly misinformed McCoy about the viability of those protections once he signed a plea agreement.

enhancement for his participation in all ten robberies, thereby receiving the benefit of the alleged bargain he struck with the Government by entering into the February 22, 1995 proffer agreement. Regardless of the remedy he seeks, practically speaking, the critical question is whether McCoy voluntarily and knowingly entered his guilty plea.

■ In light of his open court testimony at the change of plea hearing,[16] McCoy faces a "formidable barrier" in proving that he did, in fact, plead guilty based upon his counsel's misrepresentations. *Blackledge v. Allison,* 431 U.S. 63, 73–74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). Nonetheless, this barrier is not "insurmountable" because "guilty pleas are not voluntary where they are induced by misleading statements of defense counsel." *Dickerson v. Vaughn,* 90 F.3d 87, 91 (3d Cir.1996) (citing cases); *see also Laycock v. State of N.M.,* 880 F.2d 1184, 1186 (10th Cir.1989) (finding that plea may be involuntary when attorney "materially misinforms the defendant of the consequences of the plea").

■ The burden of proving a claim of ineffective assistance of counsel rests upon the criminal defendant. *See Government of Virgin Islands v. Nicholas,* 759 F.2d 1073, 1081 (3d Cir.1985). A claim for ineffective assistance of counsel must meet the two-part test established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, McCoy must show that counsel's assistance fell below an objective standard of reasonableness. *Id.* at 687–96, 104 S.Ct. 2052. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Second, McCoy must show that there is a "reasonable probability" that, but for counsel's errors, the result of the hearing would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

■ The plea bargain stage is a critical stage at which the Sixth Amendment right to effective assistance of counsel attaches. *See United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435, 438 (3d Cir.1982). Thus, the standards enunciated in *Strickland* apply equally to uninformed guilty pleas that are alleged to be the result of ineffective counsel. *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). McCoy must first show that his counsel's performance relating to the plea was unreasonable. Second, "to satisfy the 'prejudice' requirement [of *Strickland*],

16. At the evidentiary hearing, McCoy conceded that his belief that the February 22, 1995 agreement was still in effect was contradicted by his testimony at the change of plea hearing that there were no other agreements other than that embodied in the written plea agreement. McCoy argues, however, that, based on his counsel's representation, he believed that the February 22, 1995 agreement was "separate and apart" from the guilty plea agreement. *See* Evidentiary Hearing Tr. 3/16/99 at 99; *see also* App. at 26–27 (Letter of Shepard to McCoy dated Sept. 27, 1996). The court finds that a letter, dated well after the events in question here, is not relevant to what McCoy may have believed at the time he entered his plea. Moreover, an equally plausible reading of Shepard's September 27, 1996 letter is that the proffer agreement was not operational after the plea agreement was signed and therefore "separate and apart" of the plea agreement.

McCoy also points to the fact there was at least one other "side agreement" he had with the Government that was not brought to the attention of the court by either counsel for the Government or McCoy at the change of plea hearing, i.e., that the federal authorities would notify the state authorities regarding the federal prosecution of McCoy with the idea that McCoy would not be subject to additional state prosecution. Thus, McCoy argues, he should not be punished for not mentioning his belief that the February 22, 1995 agreement still existed at the change of plea hearing when neither the Government nor his own counsel mentioned this "side agreement" regarding state prosecution to the court.

[McCoy] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." [17] *Id.* at 59, 106 S.Ct. 366. In setting forth that standard, the Court in *Hill* emphasized the "fundamental interest in the finality of guilty pleas." *Id.* at 58, 106 S.Ct. 366.

■ Attorney-client communication, particularly during the plea negotiation stage, assures the continued viability of the adversary process. *See generally Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("[A criminal defendant] requires the guiding hand of counsel at every step in the proceedings against him."); *see also Henderson v. Frank,* 155 F.3d 159, 170 (3d Cir.1998) (stressing the importance of counsel at all critical stages of proceedings). Although an attorney is not required to explain every legal and strategic nuance to his client, counsel must make "objectively reasonable efforts" to communicate the terms and consequences of a plea offer to the defendant. *See, e.g., United States v. Gambino,* 101 F.3d 683 (2d Cir.1996) (unpublished op.); *see also United States v. Day,* 969 F.2d 39, 43 (3d Cir.1992) (finding that trial counsel is not required to "give [the] defendant anything approaching a detailed exegesis of the myriad arguably relevant nuances of the Guidelines"); *Johnson v. Duckworth,* 793 F.2d 898, 902 (7th Cir. 1986) (involving a rejection of a guilty plea, finding that defense counsel is under duty to explain to defendant terms of agreement and consequences that attend its re-

jection); *United States v. Gordon,* 979 F.Supp. 337, 340–41 (E.D.Pa.1997) ("To be sure, a defense lawyer's duty to assist the defendant make 'informed strategic choices' requires the lawyer to canvass with the defendant the advantages and disadvantages of a guilty plea if the Government proffers a plea agreement.").

■ On this point, the Third Circuit has instructed that counsel's affirmative misrepresentation of an applicable sentencing range if defendant opted to go to trial constitutes substandard assistance. *Day,* 969 F.2d at 43–44. Consequently, "failure to accurately inform [a] client of the comparative sentence exposure between standing trial and accepting a plea offer may fall below a reasonable standard of performance...." *Johnstone v. United States,* No. CIV.A. 98–7369, 1999 WL 672946, at *11 (E.D.N.Y. Aug. 25, 1999).

■ In this case, Shepard testified at the evidentiary hearing that he explained to McCoy when McCoy was contemplating signing the proffer agreement in February of 1995 that if McCoy later pleaded guilty, he would lose the protections set forth in the proffer agreement. *See* Evidentiary Hearing Tr. 3/16/99 at 12, 14, 21.[18] Shepard also testified that Hall explained to McCoy when McCoy signed the proffer agreement that, by entering a plea agreement, McCoy would be held responsible for all the robberies. *See id.* at 21. Likewise, Hall testified that he consistently communicated to Shepard that section

**17.** It is important to note that the applicable standard does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only "reasonable probability" that that is the case. *See Day,* 969 F.2d at 45 n. 8.

**18.** Contrary to McCoy's assertions, Shepard's later efforts seeking to persuade this court to transform the February 22, 1995 proffer agreement into an agreement covered by section 1B1.8 of the Sentencing Guidelines, his subsequent letters to the Probation Office regarding the continued viability of the proffer

agreement, and his briefing on appeal do not imply that Shepard informed McCoy prior to McCoy pleading guilty that the proffer agreement was a section 1B1.8 agreement or that the proffer agreement's protections survived signing the plea agreement. Rather, as testified by Shepard, that was an idea he and McCoy came up with during August of 1995. Defense counsel have the duty, consistent with ethical obligations, to seek to change or reasonably stretch the law to the benefit of their clients when possible. The court finds McCoy's testimony to the contrary not credible.

1B1.8 immunity was never an option for McCoy. *Id.* at 107–09, 116, 123–25.

Despite these explanations by Shepard and Hall, the evidence in support of McCoy's claim that Shepard's conduct fell below an objective standard of reasonableness has some appeal. It is doubtful that Shepard could have effectively reviewed the final draft of the proposed plea agreement simply by having his secretary read the lengthy agreement to him over the telephone while he was vacationing in a foreign spot. It is also questionable that Shepard could have effectively explained to McCoy the ramifications of a plea agreement without having gone over with McCoy, in a face-to-face meeting, the actual final version of the agreement drafted by the United States Attorney's office.[19] Nor is it helpful to Shepard that although he keeps detailed notes of his conversations with criminal defense clients as a matter of practice, and admittedly did so in this case, he was unable to produce any notes referring to any conversations he had with McCoy where he explained to McCoy that by pleading guilty, McCoy would lose the protections that the proffer agreement had extended to him concerning his participation in all the robberies that he had admitted to during the proffer sessions—an important part of Shepard's negotiations with the Government. Equally unhelpful is Shepard's failure to provide any explanation to the court regarding the apparent agreement he had with the Government whereby the federal authorities would notify the state authorities of McCoy's federal prosecution in an effort to avoid state prosecution of McCoy for the ten robberies, an agreement which neither he nor AUSA Wzorek disclosed to the court during the change of plea hearing.

In any event, regardless of the advice or lack of advice Shepard may have provided to McCoy prior to McCoy's signing the plea agreement, and even if McCoy had met the first prong of *Strickland,* McCoy cannot meet *Strickland*'s second prong, i.e., "that, but for counsel's error, he would not have pleaded guilty." *See, e.g., Day,* 969 F.2d at 44 (remanding case to trial court because even if defendant "received substandard assistance from counsel, to justify relief he must prove sufficient prejudice"); *Duckworth,* 793 F.2d at 902 n. 3 (noting that even if defendant had proved counsel acted unreasonably, defendant must show "the necessary prejudice to justify habeas relief"). The facts before the court in *Johnstone* illustrate this failure.

In *Johnstone,* the defendant claimed, also in a section 2255 motion, that his counsel was ineffective because his counsel never informed him that the cooperation agreement he signed allowed the Government to use, at sentencing, the information he had revealed during his previous proffer sessions. The court found that there was nothing in the record that indicated precisely what information counsel had imparted to the defendant. The court stated, however, that in such a case, "the issue is whether the defendant was aware of actual sentencing possibilities, and, if not, whether accurate information would have made any difference in his decision to enter a plea." *Johnstone,* 1999 WL 672946, at *11 (quoting *Ventura v. Meachum,* 957 F.2d 1048, 1058 (2d Cir.1992)). The court then examined the defendant's actions during the plea colloquy. At the plea colloquy, the defendant acknowledged that he faced a maximum sentence of life imprisonment and had no questions for the court about it. *Id.* The district court found this to be compelling evidence that, "regardless of his belief about the admissibility of his proffer testimony, he was apprised of the actual sentencing possibilities he faced." *Id.*

A review of the plea colloquy here yields even more striking results. First, even if Shepard did not review the plea agreement with McCoy before McCoy signed it

---

19. Shepard arguably rectified this situation during the recess of the July, 1995 change of plea hearing when, at the court's instruction, he spent several hours reviewing "line-by-line" the plea agreement with McCoy.

in March of 1995, the record is clear that, at the express direction of the court, he did so "line-by-line" for several hours immediately prior to McCoy's entering his guilty plea on July 10, 1995. Therefore, there is no prejudice flowing from Shepard's conduct in failing to review the plea agreement with McCoy before he signed it or his failure to be present with McCoy at the time McCoy signed the agreement and subsequently testified before · the grand jury. Second, on direct appeal, the Third Circuit found that the plea agreement itself "did not contain any language limiting the use of the information that McCoy had provided in the off-the-record proffers." *United States v. McCoy,* 107 F.3d 9 (3d Cir.1997). Similarly, the Third Circuit also found that "when [this] court asked at the plea hearing whether there were any other agreements or promises in addition to the written plea agreement, McCoy said there were not." *Id.* Thus, McCoy cannot argue that the Government somehow reneged on any alleged agreement or promise he now contends existed. Third, at the change of plea hearing, the factual basis for the plea as articulated by the Government included all ten robberies in which McCoy had participated. *See* Change of Plea Tr. 7/10/95 at 18. When asked if the AUSA had given an accurate summary of what had happened in the case, McCoy responded, "Yes." [20] *Id.* at 20. Consequently, McCoy cannot contend that it was understood that the Government was simply going to ignore his involvement in all ten robberies. Fourth, the court questioned McCoy as to whether he understood that the maximum penalty he faced in this case was forty years imprisonment, to which McCoy answered, "Yes." *Id.* Fifth, McCoy acknowledged that his counsel had reviewed the Sentencing Guidelines with him and that the court could, in appropriate circumstances, impose a sentence more severe than recommended by the Guidelines. *Id.* at 20–21. Finally, when asked by the court if he had any questions or wished to make any additional statements prior to entering his plea, McCoy chose to remain silent. *Id.* at 24. Indeed, McCoy's own testimony demonstrates that he was aware of the sentencing possibilities and that he voluntarily pleaded guilty based on that knowledge. *See, e.g., United States v. McNair,* No. CIV.A. 98–6021, 1999 WL 281308, at *4 (E.D.Pa. May 3, 1999) (involving defendant's claim that his guilty plea was not voluntary because he did not understand the ·consequences of his guilty plea and finding that the guilty plea colloquy thoroughly explored his understanding of the terms of the agreement). Thus, even if Shepard's conduct fell below an objective standard of reasonableness, because McCoy was aware of the sentencing possibilities and voluntarily and knowingly pleaded guilty, under the circumstances of this case McCoy has suffered no prejudice.

## V. CONCLUSION

McCoy has cast some doubt that his counsel's performance was reasonable. Regardless, McCoy, like the defendant in *Johnstone,* has failed to show a reasonable probability "that, but for his counsel's alleged errors, he would not have pleaded guilty." [21] Accordingly, his plea was voluntary, his instant claim of ineffective assistance of counsel fails, and his motion, filed

**20.** Prior to McCoy's response, defense counsel objected to the Government's summary of the facts to the extent it described McCoy as a leader. McCoy agreed to the summary of facts with that modification stated by counsel.

**21.** To the extent that McCoy seeks to distinguish his situation from that of the defendant in *Johnstone* by pointing to his testimony at the evidentiary hearing that his responses to the court's questions at the change of plea hearing were the result of Shepard whispering the answers into his ear, *see* Evidentiary Hearing Tr. 3/16/99 at 98–99, the court finds McCoy to be not credible. In addition, McCoy admitted at the evidentiary hearing that he "may" have told the AUSA at the day of the change of plea that "maybe [he wouldn't] plead guilty today." *Id.* at 81. The court finds that McCoy was simply trying to pressure the Government into offering him a less harsh alternative, a tactic which reflects on his instant credibility as well.

pursuant to 28 U.S.C. § 2255, must be denied. An appropriate order follows.

### ORDER

AND NOW, this 28th day of April, 2000, after conducting an evidentiary hearing at which both parties participated and upon consideration of the various documents of record, it is hereby ORDERED that:

1. Petitioner's motion to vacate the judgment of conviction and sentence, filed pursuant to 28 U.S.C. § 2255 (doc. # 408), is DENIED;

2. No probable cause exists to issue a certificate of appealability;

3. Petitioner's motion for summary judgment (doc. # 421) is DENIED as MOOT.

AND IT IS SO ORDERED.